**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1888

RICHARD BUNN,

Plaintiff - Appellee,

v.

OLDENDORFF CARRIERS GMBH & CO. KG,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  William M. Nickerson, Senior District Judge.  (1:10-cv-00255-WMN)

Argued:  May 16, 2013                 Decided:  July 17, 2013

Before MOTZ, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge Davis wrote the majority opinion, in which Judge Wynn joined.  Judge Motz wrote a dissenting opinion.

**ARGUED:** Geoffrey S. Tobias, OBER, KALER, GRIMES & SHRIVER, Baltimore, Maryland, for Appellant.  Bernard Jerome Sevel, ARNOLD, SEVEL & GAY, P.A., Towson, Maryland, for Appellee. **ON BRIEF:** Jack R. Daley, OBER, KALER, GRIMES & SHRIVER, Baltimore, Maryland, for Appellant.  Gerald F. Gay, ARNOLD, SEVEL & GAY, P.A., Towson, Maryland, for Appellee.

DAVIS, Circuit Judge:

Defendant-Appellant Oldendorff Carriers GmbH & Co. KG ("Oldendorff") appeals from a judgment entered on a jury verdict under § 5(b) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b) (the "Act"). The claim arose when the longshoreman, Plaintiff-Appellee Richard Bunn, slipped and fell on Oldendorff's ship, the CHRISTOFFER OLDENDORFF ("the ship"), during loading operations in the Baltimore port. For the following reasons, we reject Oldendorff's challenges and affirm the judgment.

I.

Bunn, who worked for the stevedore, CNX Marine Terminals, Inc. ("CNX"), slipped on ice and injured himself while loading coal onto the ship, a bulk carrier, on February 16, 2007. We set forth the facts in the light most favorable to Bunn, the prevailing party at trial.

CNX shift supervisor Joseph White boarded the ship around 7 p.m. on February 15, 2007, to tell chief officer Andriy Fediv that CNX employees intended "to start[] loading that night." J.A. 113-14. Although the ship had been docked "a few days," CNX had been "unable to load [the] vessel" because of "some winter weather." Id. at 113. When White boarded the ship, "[he] noticed that . . . there was ice covered throughout the ship, with the exception of . . . a pathway back from the gangway to the

2

deckhouse." Id. at 114. White "instructed" Fediv, "[W]e need a clear path to the holds to be able to load this vessel." Id. Fediv, who knew "which hatches [the CNX employees] were going to be [loading]," responded "[t]hat [the ship's crew] would salt and sand between the holds." Id. at 115–16.[1]

Based on this conversation, White told longshoreman Christopher Moxey (before the loading operation started) that the ship's crew was "going to treat the ship and make sure it was safe" by "[s]alt[ing] it, sand[ing] it, [and] shovel[ing] it." J.A. 86–88. Hours later, when Moxey and Bunn walked onto the ship, they found the area between the gangway and the deckhouse, and between the starboard rail and hatch number five, "[p]erfectly clear" of ice. Id. at 88–89.

Meanwhile, Bunn had arrived at the terminal at 6 p.m. on February 15, 2007, and began his 12-hour shift an hour later. His job was "to clean the terminal and to spread salt, and to go around and make sure all the equipment . . . was . . . . fueled and running . . . ." J.A. 223. Sometime between midnight and 1 a.m. on February 16, 2007, White approached Bunn to discuss loading the ship. Id. at 30, 224. Specifically, White instructed

---

[1] Fediv, the chief officer, testified that the ship's deck was icy but he denied that he and White discussed using salt and sand to treat the ice. Of course, the jury was entitled to reject Fediv's testimony and credit White's, as it did.

Bunn to work onboard the ship during the night to assist Moxey in the loading operation. Bunn asked:

> well, you want me to go now? [White] said no, take your time, finish lunch. He said they're getting the ship ready and we're still finishing up getting the terminal ready.

Id. at 224–25. White told Bunn he would call him or Moxey by radio when the ship was safe to load. Id. at 225.

In due course, Bunn and Moxey "had the instruction that it was okay to go up on the ship, the ship was ready," and the two boarded the ship around 1:30 a.m. on February 16, 2007. J.A. 177–78. Bunn testified:

> When we first got up on [the] deck, we could see a clear path to the number five hatch, and looking towards the deckhouse, you could see there was a path made to the deckhouse.

Id. at 178. Bunn and Moxey began loading coal into the number five hatch. Id. at 178. During the loading process, coal moves from a silo to a ship loader, id. at 121, "a giant crane that hangs over the ship," id. at 179.

> It has a boom with a conveyor belt on it that carries the coal. At the end of the boom, it has a spoon that comes down that goes in the hold. It has a spoon that rotates, and that directs the coal.

Id. at 179. Bunn's job was to be on the ship and help guide the coal as it was loaded into the holds.

> Being that the ship loader operator is up in the air, and he sits on one side of the machine, he can't see exactly what we can see when we're close to the hold. So in order to keep everything safe, we have to watch

4

his equipment, that he doesn't hit the hatch cover, and also direct him on where's the proper places to put the coal . . . . [T]he only way I see it is if I lean forward over the hold, I can see down in there how the coal is building up.

Id. at 179-80.

After loading the number five hatch, Bunn told Moxey to warm himself in the deckhouse; Bunn walked forward to load the number three hatch, "holding onto the hand rail on the side of the ship," J.A. 180-82, whereupon the accident occurred:

It was nighttime. It's not much lighting when you get further past the beginning of the ship. At the beginning of the ship, the deckhouse has lights. But as you get down, the lighting is very poor.

* * *

Well, I remember coming off the path, and it felt like I stepped up a little bit. I could tell my surface changed a little.

I took a couple steps, and the next thing I knew, I had slipped and fell right then, boom; but I caught myself with my knees and my hands when I fell.

* * *

Well, then I realized that I kind of hurt myself, so I took my time. Then I figured well, maybe I'm just on a patch of ice that I didn't see and maybe I need to find where this path is.

So I stood up and I said I'm going to slowly walk, take little steps toward the hold. I still needed to get to the hold . . . . So I started to walk towards the hold, and no more than one, two steps and boom. My feet came out from underneath of me and I landed on my back and my elbow.

Id. at 182-84.

5

After Bunn's fall, Moxey told chief officer Fediv that "the ship was icy forward" and that it needed to be salted. J.A. 90. Fediv responded that "he only had a limited supply of salt." Id. at 91. About a half hour later, Moxey loaded coal into hatch number seven. Id. at 92. When he returned to hatch number three, he "noticed that it was still icy." Id.

At the close of Bunn's case, and again at the conclusion of all the evidence, Oldendorff moved for judgment as a matter of law.[2] The company argued (as it had in seeking summary judgment earlier) that it owed no duty under the Act to warn of the open and obvious danger posed by the presence of ice in the areas where the longshoremen would be working. The district court denied the motions, reasoning that "liability can attach to [a] ship owner" that "voluntarily and affirmatively undertakes to remedy an [otherwise open and obvious] unsafe condition, but fails to do so." Bunn v. Oldendorff Carriers GmbH & Co. K.G., No. WMN-10-255, 2012 WL 2681412, at *1 (D. Md. July 5, 2012). The court noted that, based on White's testimony, the jury could conclude that the ship--on the unquestioned authority to do so

---

[2] See Mot. for J. as a Matter of Law 2, ECF No. 86, Bunn v. Oldendorff Carriers GmbH & Co. K.G., No. 1:10-cv-00255-WMN (D. Md. May 10, 2012). The joint appendix includes neither a complete trial transcript nor excerpts of the oral motions and the district court's reasons for denying them. Accordingly, we infer that information from the court's memorandum opinion denying Oldendorff's post-trial motion for judgment as a matter of law.

of the chief officer, Fediv--had "voluntarily assumed the responsibility for salting and sanding the ice in the places where he knew CNX personnel would be working." Id. at *2.

The district court also declined to give the following jury instruction, requested by Oldendorff:

> In the absence of any agreement, the ship is not responsible for any open and obvious condition.

J.A. 84. The court instructed the jury as follows:

> The plaintiff's claims in this case are governed by the law that is set out in what we know as the Longshoreman and Harbor Workers Act. In accord with the law, your basic determination in this case is going to be to decide whether negligence on the part of the operator of the vessel CHRISTOPHER OLDENDORFF caused or directly contributed to the plaintiff's accident on or about February 16, 2007, and the damages claimed to have resulted from that occurrence . . . .
>
> * * *
>
> Negligence, simply stated, is the failure to exercise reasonable care under the existing circumstances.
>
> But once the loading or the unloading of a ship by a stevedoring company has begun, the responsibility for safe working conditions is generally the burden of the terminal or the stevedoring company, in this case, CNX Marine Terminal. A shipowner, Oldendorff Carriers in this case, will only be responsible or liable for injury resulting directly from an unsafe condition on the ship of which it was aware and which it voluntarily agreed and undertook to remedy, but failed to do so.

Id. at 385-87.

The jury found Oldendorff negligent and calculated $1,863,750 in pecuniary and non-pecuniary damages. J.A. 406-07.

7

The jury further found, however, that Bunn was also negligent, and that he was 15 percent at fault for the accident. Id.

Oldendorff renewed its motion for judgment as a matter of law and moved alternatively for a new trial, arguing that the court had erred in refusing to give an instruction on the "open and obvious" defense. Mot. for J. as a Matter of Law 17, Docket No. 86, Bunn, No. 1:10-cv-00255-WMN (D. Md. May 10, 2012). The court denied the post-trial motions, and this timely appeal followed.

## II.

Oldendorff raises two principal assignments of error. First, Oldendorff argues that the district court erred in denying the motions for judgment as a matter of law. Second, Oldendorff argues that the district court misinformed the jury about the applicable law, and therefore erred in denying the motion for new trial. We discern no reversible error.[3]

---

[3] Oldendorff also argues that the district court erred in denying its motion for summary judgment made at the conclusion of discovery because, as a matter of law, the icy condition of the ship was open and obvious, and therefore Oldendorff had no duty to warn of the danger (the same argument made at and after trial). Although neither party has addressed the propriety of Oldendorff's purported appeal of the summary judgment ruling, it is well settled that we "'will not review, under any standard, the pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits.'" Varghese v. Honeywell Int'l, Inc., 424 F.3d 411, 421 (4th Cir. 2005) (quoting Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g (Continued)

8

Oldendorff first argues that the district court erred in denying its motions for judgment as a matter of law because "[t]he open and obvious nature of the icy deck was established beyond dispute," and Oldendorff had "a responsibility to warn only of hidden dangers." Opening Br. 8, 17.[4] Those assertions are correct statements of the law, as far as they go. The problem for Oldendorff is that its liability does not depend on the duty to warn; rather, as the district court repeatedly (and correctly) indicated, this is a simple case of primary negligence.

1.

Section 5(b) of the Act permits a longshoreman to "seek damages in a third-party negligence action against the owner of the vessel on which he was injured." Howlett v. Birkdale

---

Corp., 51 F.3d 1229, 1237 (4th Cir. 1995)). There is no reason to deviate from that rule here.

[4] Our applicable standard of review in these circumstances is well-settled:

> We review the denial of a Rule 50(b) motion de novo, viewing the evidence in the light most favorable to the prevailing party, and will affirm the denial of such a motion unless the jury lacked a legally sufficient evidentiary basis for its verdict. First Union Commercial Corp. v. GATX Capital Corp., 411 F.3d 551, 556 (4th Cir. 2005).

Gregg v. Ham, 678 F.3d 333, 341 (4th Cir. 2012).

Shipping Co., S.A., 512 U.S. 92, 96 (1994). The Act does not, however, "specify the acts or omissions of the vessel that . . . constitute negligence"; rather, "the contours of a vessel's duty to longshoremen [have been] . . . resolved through the application of accepted principles of tort law and the ordinary process of litigation." Howlett, 512 U.S. at 97–98 (internal quotation marks omitted). In Scindia Steam Navigation Co., Ltd. v. De Los Santos ("Scindia"), the Supreme Court "outlined the three general duties shipowners owe to longshoremen." Id. at 98 (citing Scindia, 451 U.S. 156 (1981)).

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore.

Id. (internal citations omitted) (citing Scindia, 451 U.S. at 167–78). Here, only the turnover duty is at issue.

"The turnover duty has two components." Lincoln v. Reksten Mgmt., 354 F.3d 262, 266 (4th Cir. 2003).

> The first involves the shipowner's duty with respect to the ship's gear, equipment, tools, and work space that the stevedore will utilize during its operations. The shipowner must "at least [exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of

10

reasonable care to carry on its cargo operations with reasonable safety to persons and property."

Id. (alteration in original) (emphasis added) (quoting Scindia, 451 U.S. at 166–67). "As a corollary to this initial turnover duty," the shipowner must

> warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

Id. (emphasis added) (quoting Scindia, 451 U.S. at 167). "The duty to warn attaches only to latent hazards," id. (quoting Howlett, 512 U.S. at 99–100); "[i]f a defect is open and obvious and the stevedore should be able to conduct its operations around it safely, the shipowner does not violate the duty to warn," id.

In denying Oldendorff judgment as a matter of law, the district court reasoned that "[t]he validity of [the] [open and obvious] rule or its applicability to ice on the deck under general circumstances [was] never . . . in dispute." Bunn, 2012 WL 2681412, at *2 (emphasis added).

> What was in dispute was whether Fediv voluntarily assumed the responsibility for salting and sanding the ice in the places where he knew CNX personnel would be working.

11

Id. The court further reasoned that, "while ice on the deck may [have] be[en] open and obvious, it was not obvious that the ship owner would promise to take care of the hazard, and then not do so." Id.

> [W]hen a ship owner voluntarily and affirmatively undertakes to remedy an unsafe condition, but fails to do so, liability can attach to the ship owner . . . . Thus, there was no question that the central determination regarding liability to be reached at trial was whether Fediv had promised to clear those portions of the deck where those unloading the vessel would need to traverse.

Id. at *1. Because the jury could reasonably credit White's testimony that Fediv had promised to treat ice leading to and around the cargo holds, the court concluded that the jury could reasonably find Oldendorff liable for affirmatively undertaking, and failing, to remedy the unsafe condition. Id. at *2 & n.1. That is, the jury could reasonably find Oldendorff liable for simple negligence.

2.

We find no error in the district court's reasoning. Several other circuits have long held that a shipowner may be liable under the Act for promising, yet failing, to remedy a dangerous condition that injures a longshoreman. See Lieggi v. Maritime Co. of the Philippines, 667 F.2d 324, 325–26, 329 (2d Cir. 1981) (affirming a judgment against a shipowner whose agent had "affirmatively undert[aken]," but failed, to remove wire and

12

grease spots that caused a longshoreman's injuries because, "by making this affirmative undertaking, the owner [had] eliminated any possible reasonable basis for relying on the stevedore to correct the hazardous condition"); Bueno v. United States, 687 F.2d 318, 320–21 (9th Cir. 1983) (finding that a shipowner may be liable for a longshoreman's injury aboard the ship when it "voluntarily undert[akes] to check the safety of the vessel on a regular basis"); Webster v. M/V Moolchand, Sethia Liners, Ltd., 730 F.2d 1035, 1037–38 (5th Cir. 1984) (affirming a jury's finding of liability against a shipowner because "there was evidence that the winch [that injured the longshoreman] was not operating properly, that this was brought to the crew's attention, and that their repair efforts failed").[5]

Holding a shipowner liable for promising, but failing, to remedy a dangerous condition comports with "accepted principles of tort law," which inform a shipowner's duties under the Act.

---

[5] Although some scholars view the relevant duty in Lieggi and Webster as one of active involvement, not turnover, see 1 Thomas J. Schoenbaum & Jessica L. McClellan, Schoenbaum's Admiralty & Maritime Law § 7-10 (5th ed. 2012); Kenneth G. Engerrand & Jonathan A. Tweedy, A Tedious Balance: Third Party Claims Under the Longshore and Harbor Workers' Compensation Act, 10 Loy. Mar. L.J. 1, 20 (2011), the Supreme Court has found that the general principles supporting one duty under the Act may apply to other duties, as well, Howlett, 512 U.S. at 102. For the reasons given in text, we can discern no good reason to limit liability arising from a shipowner's breach of a promise to correct a dangerous condition, even one that is otherwise "open and obvious," to the "active involvement" rubric.

_Howlett_, 512 U.S. at 97–98.[6] These principles include the general rule that "undertakings can create a duty of care." Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, _Dobbs' Law of Torts_ § 410 (2d ed. 2012) (noting that "one who voluntarily assumes a duty must then perform that duty with reasonable care"). "An undertaking in this sense is a kind of explicit or implicit promise, or at least a commitment, conveyed in words or in conduct." _Id._ (footnote omitted).

> The general rule is that the defendant is under a duty to perform undertakings made for safety purposes and is liable for physical harm he causes the plaintiff by negligently performing or quitting performance once it has begun.

_Id._ at § 411. _Accord_ _Dalldorf v. Higgerson-Buchanan, Inc._, 402 F.2d 419, 422 (4th Cir. 1968) ("[A]nyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.") (internal quotation marks omitted). Because the credible evidence showed that Fediv promised to treat the ice but failed to do so, the jury reasonably concluded that Fediv had failed to exercise due care.

Holding a shipowner liable for promising, yet failing, to remedy a hazard also comports with a well-settled principle of

---

[6] Notably, Bunn's complaint alleged negligence for both failing to warn of the untreated ice, and for promising yet failing to treat the ice in the first place. _See_ J.A. 13–14 (Compl. ¶¶ 10, 12).

14

the turnover duty: the scope of that duty depends on the circumstances of each particular case. See Lincoln, 354 F.3d at 266 (noting that a shipowner must exercise ordinary care "under the circumstances to have the ship" in a reasonably safe condition) (emphasis added). When the circumstances include a promise to remedy a dangerous situation, the shipowner may fail to exercise reasonable care if it does not fulfill its promise.[7] Here, the evidence viewed in the light most favorable to Bunn established that Fediv promised to treat the ice, and failed to do so (perhaps because he "had a limited supply of salt," see supra, at 6). These circumstances provide a legally sufficient evidentiary basis for holding Oldendorff liable for Bunn's injuries.

3.

Apart from the fact that the jury verdict permissibly rested on a finding of simple negligence, Oldendorff's argument

---

[7] Our colleague in dissent insists that when the circumstances include an open and obvious hazard, the shipowner "has a diminished turnover duty of safe condition." Post, at 35 (citing cases from outside the Fourth Circuit). For the reasons stated infra in Part II.A.3, however, the untreated ice was neither open nor obvious. Moreover, in none of the cases cited by the dissent did the shipowner expressly promise, and fail, to remedy the hazardous condition. See, e.g., Pimental v. LTD Can. Pac. Bul, 965 F.2d 13, 15 (5th Cir. 1992) (observing that the plaintiff had "offered no proof that the[] [hazardous] conditions were reported to the vessel crew"), cited post, at 35.

that the ice was "open and obvious" conveniently overlooks the fact that the presence of <u>untreated</u> ice was assuredly <u>not</u> "open and obvious," and betrays the company's misplaced, narrow view of the turnover duty.[8] That a shipowner <u>generally</u> need not warn of open and obvious dangers does not negate the shipowner's duty to exercise ordinary care <u>under the circumstances</u> to ensure that the ship is in a reasonably safe condition. <u>Lincoln</u>, 354 F.3d at 266 (quoting <u>Scindia</u>, 451 U.S. at 166–67). After all, the duty to warn is a mere corollary to the turnover duty, not the sole manner of measuring the reasonableness of a shipowner's actions upon turnover. <u>See</u> <u>id.</u> (quoting <u>Scindia</u>, 451 U.S. at 167). In other words, failure to warn of a latent hazard is but one way a shipowner may violate its turnover duty; promising, but failing,

---

[8] Contrary to our dissenting colleague's assertion, Bunn did not concede that the untreated ice that he encountered near hatch number three was open and obvious. <u>See</u> <u>post</u>, at 40. Although Bunn asserted in his appellate brief that "the ice-covered condition of the <u>deck</u> was open and obvious," Resp. Br. 18 (emphasis added), he maintained that, following Fediv's promise, "the lack of treatment with sand and salt of the ice in the <u>darkened area where [he] was obliged to work</u>"--i.e., the area near hatch number three--"was not open and obvious," <u>id.</u> (emphasis added). <u>See also</u> Opp'n to Mot. for Summ. J, <u>Bunn v. Oldendorff Carriers GmbH & Co. K.G.</u>, No. 1:10-cv-00255-WMN (D. Md. Nov. 18, 2010), ECF No. 27, at 6 ("With the assurance by the chief officer that he would make the slippery condition safe, the slippery condition that continued to exist because of the failure on the part of [Oldendorff] to correct same as promised was no longer open and obvious . . . . [U]ntil [Bunn] fell, the fact that [the slippery condition] had not been made safe was neither open nor obvious to [CNX].").

16

to remedy a dangerous condition may also establish a shipowner's failure to exercise ordinary care.

In any case, imposing liability on a shipowner that promises, but fails, to remedy a dangerous condition, and then fails to warn of its own failure, is not inconsistent with our prior cases on the open and obvious rule. Although a shipowner need not warn of hazards that would be "obvious to or anticipated" by a stevedore, Lincoln, 354 F.3d at 266 (quoting Scindia, 451 U.S. at 166–67), a reasonably competent stevedore has no reason to anticipate a hazard that the shipowner has promised to remedy but fails, without warning, to do so.[9] Here, for instance, the evidence viewed in the light most favorable to

_____

[9] The dissent asserts that "a shipowner can reasonably rely on an expert and experienced stevedore and its expert longshoremen to notice and avoid an open and obvious hazard," regardless of the shipowner's "pre-turnover promise" to remedy the hazard. Post, at 38–39. That may well be true when the hazard remains open and obvious despite the unfulfilled promise to remove it--imagine, for instance, a longshoreman encountering a large oil slick in bright sunlight--but that is not the case here. Common experience tells us that, unlike a brightly-lit oil slick, ice may not be immediately visible, especially in the dark. And viewing the evidence in the light most favorable to Bunn, the untreated ice he encountered was neither open nor obvious. Bunn discovered the ice--at night, in a poorly lit area--only after taking the few steps that led to his fall. Moreover, because Fediv knew where the CNX employees would be working and had promised more than five hours before they commenced work to treat the ice with salt and sand, Bunn had no reason to anticipate a slippery surface near the number three hatch. Thus, the untreated ice was a latent hazard. See, e.g., Lincoln, 354 at 266 (describing latent hazards as those that "would not be . . . anticipated by" a longshoreman) (emphasis added) (quoting Scindia, 451 U.S. at 167).

17

Bunn established that Fediv promised to treat the ice; accordingly, a jury could find that neither CNX (the stevedore) nor Bunn (the longshoreman) had reason to anticipate untreated ice aboard the ship, even though one might otherwise have expected such a hazard following a winter storm.[10]

We are not persuaded by Oldendorff's argument that, regardless of Fediv's promise to treat the ice, the untreated ice remained an open and obvious condition as a matter of law, absolving it of liability, even without Fediv communicating the presence of the untreated ice to the stevedore.[11]

---

[10] Indeed, several witnesses testified that shipowners generally bear responsibility for removing ice. See, e.g., Kevin Palmer Test., J.A. 146 (testifying that "[it] would be usual" for a ship's crew to "be scraping the ice off their deck"); White Test., J.A. 115 ("It's [the chief mate's] responsibility, the vessel's responsibility to clear [the ship], to make it safe for stevedores[,] of the ice and the other debris that could be up there.").

[11] It is readily apparent in its briefs and oral argument that Oldendorff feels itself hemmed in by its inability to lay much (if not all) of the blame for Bunn's injury on his employer, CNX. There is some force to Oldendorff's understandable chagrin in this regard. Although Fediv promised to make the work areas safe for the longshoremen loading the coal, White, the CNX shift supervisor, apparently never reboarded the ship to confirm that Fediv had done so before ordering his workers, Bunn and Moxey, to commence operations. But Congress has denied Oldendorff the opportunity it desires. See Howlett, 512 U.S. at 97:

> Section 5(b) also eliminated the stevedore's obligation, imposed by Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124 (1956), to indemnify a shipowner, if held liable to a longshoreman, for

(Continued)

Moreover, a shipowner is absolved of its duty to warn only if the condition is both open and obvious <u>and</u> the stevedore's employee is "able to conduct . . . operations around [the hazard] safely." <u>Lincoln</u>, 354 F.3d at 266 (citing <u>Bonds v. Mortensen & Lange</u>, 717 F.2d 123, 127-28 (4th Cir. 1983)).[12] The

---

breach of the stevedore's express or implied warranty to conduct cargo operations with reasonable safety.

Furthermore, even assuming that Bunn indicated on deposition or otherwise that he expects his employer to furnish a safe place to work, such testimony does not absolve the shipowner of the consequences of its direct primary negligence.

Of course, a <u>longshoreman's own negligence</u>, as opposed to the <u>negligence of his stevedore employer</u>, may reduce a shipowner's liability. And indeed, as mentioned in text, the jury here found Bunn 15 percent at fault for his injuries. Although Bunn testified that he "noticed [a] pathway" that had been cleared of ice, and "glance[d] around and [saw] ice in other areas," J.A. 226, this testimony does not establish beyond dispute that he knew--before he fell and was injured--that the ice near the number three hatch remained untreated. Indeed, Bunn also testified that he fell almost immediately upon walking toward the hold, <u>see</u> <u>id.</u> at 183 (testifying that he took only "a couple steps, and the next thing [he] knew, [he] had slipped and f[allen] right then, boom"). On this record, therefore, even had we been asked to examine the issue (and we have not been asked) we can discern no infirmity in the jury's allocation of fault.

[12] In <u>Bonds</u>, we held that the shipowner owed no duty to intervene and stop discharging operations despite a gantry crane's malfunctioning bell, which failed to ring "when the gantry move[d] forward or backward to warn longshoremen and the ship's crew of the gantry's motion." <u>Bonds</u>, 717 F.2d at 124. We reasoned that the stevedore and longshoremen "were aware that the bell was not functioning properly" and had not complained; "the malfunctioning bell and ship's design being <u>obvious and known to all</u>, the shipowner was entitled to rely on [the stevedore's] judgment as to whether discharge operations could (Continued)

19

evidence, viewed in the light most favorable to Bunn, showed that Oldendorff breached its duty to warn of the ice near the number three hatch because it was impossible for Bunn to safely navigate around the untreated ice to perform the cargo loading operations. See, e.g., J.A. 92 (Moxey's testimony that the area around hatch number three was so "icy" that it was "unsafe" to complete operations).[13]

---

safely be undertaken." Id. at 124, 127–28 & n.4 (emphasis added). The reasoning of Bonds is inapplicable when, as here, the shipowner had no reasonable basis for relying on the longshoreman's or stevedore's judgment; neither CNX nor Bunn had reason to expect the untreated ice near hatch number three after Fediv promised to treat it, and thus, the ice was not "obvious and known to all." Id. at 127–28.

[13] Contrary to our dissenting colleague's assertion, see post, at 41 n.7, the rule derived from Bonds and cited in Lincoln is not inconsistent with Howlett, which was decided nearly a decade before Lincoln. As the dissent recognizes, see post, at 33, the duty to warn is a corollary to the turnover duty of safe condition, Howlett, 512 U.S. at 98. As such, it is subject to the same governing principles, including the rule that a shipowner's liability depends on whether the stevedore is able "to carry on cargo operations with reasonable safety." Id. (internal quotation marks omitted). Indeed, several of our sister circuits--in decisions issued after Howlett--have recognized that a shipowner may be liable for failure to warn of even open and obvious hazards. See, e.g., Hill v. Reederei F. Laesz G.M.B.H., Rostock, 435 F.3d 404, 409 (3d Cir. 2006) (noting that a shipowner may be liable for not warning of an "open and obvious hazard" if "avoiding the hazard would be impractical for the longshoreman" or "the ship should have known that the longshoremen would confront the hazard"), cited post, at 35; Moore v. Angela MV, 353 F.3d 376, 381 (5th Cir. 2003) (noting that "a vessel has no duty to warn of dangers that would be obvious to a longshoreman of reasonable competence," unless "the longshoreman's only alternatives to facing the hazard are
(Continued)

(We emphasize that our discussion of the duty to warn is merely dictum.)

For all these reasons, we are not persuaded that the "jury lacked a legally sufficient evidentiary basis for its verdict," Gregg, 678 F.3d at 341, and, thus, we conclude that the district court did not err in its denial of the motions for judgment as a matter of law.

4.

Before moving on to consider Oldendorff's second issue on appeal, we feel it appropriate to offer a few respectful responses to our good friend in dissent.

Our colleague laments that

> the focus of the parties on the shipowner's promise, rather than the character of the icy conditions, and the alternatives Bunn had in facing those conditions, left the jury with insufficient evidence to find Oldendorff breached its turnover duty.

Post, at 32. But we need not decide whether there was any justification for "the [parties'] focus . . . on the shipowner's promise," id.; there clearly was, as the promise was among the circumstances that defined the standard of care. See Lincoln, 354 F.2d at 266 (noting that shipowners must exercise ordinary care "under the circumstances"). Moreover, the parties to a

---

unduly impracticable or time-consuming or would force him to leave the job").

lawsuit are entitled to frame the issues as each deems best. See, e.g., <u>Greenlaw v. United States</u>, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present . . . . [T]he parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.") (internal quotation marks omitted). The problem for Oldendorff--one from which it cannot be rescued at this stage--is that it has elected to litigate this case <u>solely</u> on the theory that it did not breach the <u>duty to warn</u>, that is, that Oldendorff owed no duty to warn of untreated ice after having promised, hours before actual turnover of the vessel for loading, to treat the ice and thereby render the areas around and abutting the holds safe. Although we have offered up plenty of <u>dicta</u> to question the legal correctness of that assertion, our affirmance of the judgment is based not on the <u>duty to warn</u> but on the more general turnover <u>duty of safe condition</u>. That is, we conclude that the district court did not err in treating the breach of Oldendorff's promise, <u>under the circumstances</u>, as a failure to exercise reasonable care in executing Oldendorff's more general

turnover duty. In short, the evidence supported the jury's finding of simple negligence.

Adopting Oldendorff's misguided view that the lawsuit implicates only the duty to warn, the dissent asserts that "the center of [our] disagreement . . . is the question of whether a shipowner's unfulfilled promise to remedy an open and obvious hazard affects its turnover duty." Post, at 32. This characterization misses the mark, not only for the reasons articulated above but because it wrongly assumes that the hazard created by the presence of ice on the deck and around the hatches remained precisely the same after Fediv's promise to treat it as it was before he made (and then breached) his promise: perfectly open and obvious. See, e.g., post, at 39 (reasoning that "[a]s long as an unremedied hazard remains open and obvious, a shipowner's liability . . . is thus extremely limited") (emphasis added). For the reasons stated above, the risk of injury from the untreated ice was decidedly not open and obvious after Fediv made and then breached his promise to treat it. We agree to disagree on that score.[14]

---

[14] To put it another way, Oldendorff should have known--after Fediv's promise and failure to treat the ice--that neither Bunn nor his stevedore employer would have expected a longshoreman to encounter the slippery surface near hatch number three. Thus, Oldendorff "should have expected that [Bunn] could not or would not avoid the hazard and conduct cargo operations reasonably safely." Kirsch v. Plovidba, 971 F.2d 1026, 1031 (3d (Continued)

Our dissenting colleague insists that a shipowner's turnover duty is narrow, see, e.g., post, at 32, 34, and that stevedores and longshoremen bear the primary burden for ensuring safe working conditions for longshoremen, see, e.g., post at 36 (observing that "a shipowner can, ordinarily, reasonably rely on the stevedore [and longshoremen] . . . to notice obvious hazards and to take steps consistent with [their] expertise to avoid those hazards where practical to do so") (alterations in original) (quoting Kirsch v. Plovidba, 971 F.2d 1026, 1030 (3d Cir. 1992)). Indeed, the dissent suggests that Bunn could have prevented his injury by, inter alia, "clear[ing] the ice himself." Post, at 42–43. But that, of course, would have required Bunn to know about the untreated ice, which he discovered only upon taking a few steps and immediately falling. Moreover, the evidence at trial overwhelmingly established (and the jury was entitled to find) that the responsibility for removing ice aboard a ship customarily rests with the shipowner. See supra n.10. As the dissent concedes, see post, at 39, custom, like any other circumstance surrounding an accident, may

---

Cir. 1992), cited in post, at 39–40. As such, the jury was entitled to find Oldendorff liable based on Fediv's failure to treat the ice as promised. Id.

24

inform a shipowner's duties to longshoremen.[15] And, of course, any negligence on the part of a stevedore--here, CNX, acting through its agent White--does not absolve a shipowner such as Oldendorff of its own duty of care. See, e.g., Woodruff v. United States, 710 F.2d 128, 132 n.9 (4th Cir. 1983) (noting that a shipowner "will be liable for the full extent of [a] [longshoreman's] injuries notwithstanding proof of concurrent negligence contributing to the injury on the part of [the stevedore], diminished only by [the longshoreman's] contributory negligence.") (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256 (1979)).

For the reasons set forth, we think to say the turnover duty is "narrow" is to speak descriptively, not prescriptively; we do not believe the Supreme Court has built the kind of impenetrable silos of theories cabining shipowner negligence with the rigidity that the dissent believes exist. If, indeed, that is the import of the rule adopted by the Third, Fifth, and Ninth Circuits, as the dissent's reliance on their precedents suggests, we choose a different path.

---

[15] The dissent risks oversimplifying the case by suggesting that darkness alone was the hazard giving rise to Bunn's injury. See post, at 44–45. As stated above, Oldendorff's liability arose from the totality of the circumstances, which included not only the ship's poor lighting, but Fediv's promise to treat the ice, his failure to do so, and the custom of shipowners taking responsibility for removing ice aboard ships.

In any event, distilled to its essence, the dissent's real concern seems to rest on its unstated belief that the jury should have found Bunn 100 percent at fault rather than merely the 15 percent the jury did find. See post, at 39 (suggesting that Bunn "shirk[ed] his duty to act with reasonable care"); but see supra n.11. But whether Bunn's failure to exercise reasonable care for his own safety constituted the sole proximate cause of his injuries--the crux of the dissent--is not presented as an issue in this case.

Finally, we confess we find somewhat puzzling the dissent's assertion that the proper outcome is neither affirmance nor judgment for Oldendorff as a matter of law, but rather, "a new trial or other proceedings." Post, at 47. Yet our good friend fails to explain what such proceedings would accomplish. Oldendorff has not, for example, challenged the sufficiency of the verdict on the grounds that the district court allowed the jury to consider unreliable, and therefore, inadmissible evidence. See, e.g., Weisgram v. Marley Co., 582 U.S. 440, 443 (2000). Nor has Bunn, as appellee, asked for a new trial if we find the district court erred in denying Oldendorff's motions for judgment as a matter of law. See Fed. R. Civ. P. 50(e); Neely v. Martin K. Elby Constr. Co., 386 U.S. 317, 327 (1967) (observing that a plaintiff-appellee may be entitled to a new trial if "[t]he erroneous exclusion of evidence . . . would have

26

strengthened his case" or "the trial court itself caused the insufficiency in [the] plaintiff-appellee's case by erroneously placing too high a burden of proof on him at trial"), cited post, at 47. The task before us, then, is quite simple, and requires no further proceedings: we need only decide "whether a jury, viewing the evidence in the light most favorable to [Bunn], could have properly reached the conclusion reached by this jury." Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (internal quotation marks omitted). For the reasons stated above, we conclude that the answer is yes, and affirm the denial of Oldendorff's motions for judgment as a matter of law.

B.

Finally, Oldendorff argues that the district court erred in denying its motion for a new trial because the court's refusal to give the company's requested "open and obvious instruction deprived the jury of a full and accurate understanding of the law," and "deprived [Oldendorff] of the opportunity to argue effectively the significance of the open and obvious defense." Opening Br. 40–41.

"We review for abuse of discretion a district court's denial of a motion for new trial," and "will not reverse such a decision save in the most exceptional circumstances." Figg v. Schroeder, 312 F.3d 625, 641 (4th Cir. 2002) (internal quotation

27

marks omitted).[16] Similarly, "[w]e review a trial court's jury instructions for abuse of discretion," keeping in mind that "a trial court has broad discretion in framing its instructions to a jury." Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 484 (4th Cir. 2007). "Instructions will be considered adequate if construed as a whole, and in light of the whole record, they adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the existing party." King v. McMillan, 594 F.3d 301, 311 (4th Cir. 2010) (internal quotation marks and brackets omitted). "Even if a jury was erroneously instructed, however, we will not set aside a resulting verdict unless the erroneous instruction seriously prejudiced the challenging party's case." Coll. Loan Corp. v. SLM Corp., 396 F.3d 588, 595 (4th Cir. 2005) (emphasis added) (internal quotation marks omitted).

Preliminarily, we hold that Oldendorff has failed to preserve a challenge to the jury instructions, as the company has provided no record of an objection to the district court. See Fed. R. Civ. P. 51(c)(1) ("A party who objects to an instruction or the failure to give an instruction must do so on

---

[16] Collapsing all its claims into one, Oldendorff erroneously contends that our standard of review of the denial of its motion for a new trial is de novo. Opening Br. 8–9, 39–41. It is not.

the record, stating distinctly the matter objected to and the grounds for the objection"). When challenging instructions on appeal, a party must "furnish the court of appeals with so much of the record of the proceedings below as is necessary to enable informed appellate review." Faigin v. Kelly, 184 F.3d 67, 87 (1st Cir. 1999) (finding that appellant's "fail[ure] to supply a transcript of the Rule 51 sidebar conference" gave rise to a "presumption that none of his challenges to the jury instructions were properly preserved"), cited in Belk, Inc. v. Meyer Corp., U.S., 679 F.3d 146, 154 n.6 (4th Cir. 2012) (finding that appellant had "waived its challenge to any jury instructions" because it had failed, inter alia, "to provide a record citation to where it objected to any given or omitted jury instruction"). See also Maltby v. Winston, 36 F.3d 548, 560 (7th Cir. 1994) (finding that the appellant had failed to preserve his challenge to jury instructions because "the instruction conference in the district court was not memorialized in the record," and the appellant had not otherwise "ma[d]e a sufficient record").

Here, Oldendorff has provided only its requested instructions, and those that the court ultimately gave the jury. "Importantly, the mere tendering of a proposed instruction will not preserve error for appeal." Kevin F. O'Malley, et al., 1 Fed. Jury Practice & Instructions § 7:4 (5th ed. 2012). See also

29

City of Richmond, Va. v. Madison Mgmt. Grp., Inc., 918 F.2d 438, 453 (4th Cir. 1990) ("Where . . . a party who has violated Rule 51 can point to nothing more than the court's denial of a requested instruction, a reading of Rule 51 loose enough to permit preservation of the point would effectively delete Rule 51 insofar as allegations of error in the failure to give an instruction are concerned.").

In any event, even were we to reach the issue, we would conclude it is meritless. For the reasons stated above, see supra Part II.A, the court properly informed the jury that a shipowner may be "liable for injury resulting directly from an unsafe condition on the ship of which it was aware and which it voluntarily agreed and undertook to remedy, but failed to do so." J.A. 387. That a shipowner generally need not warn of an open and obvious hazard does not absolve the shipowner of its more general duty to exercise ordinary care under the circumstances to ensure that the ship is in a reasonably safe condition. Lincoln, 354 F.3d at 266 (quoting Scindia, 451 U.S. at 166-67). Thus, we cannot see how Oldendorff was prejudiced, let alone seriously prejudiced, by the absence of any specific instruction on the open and obvious defense. Coll. Loan Corp., 396 F.3d at 595.

Moreover, Oldendorff's proposed instruction--"In the absence of any agreement, the ship is not responsible for any

30

open and obvious condition."--was an incomplete statement of the law in any event. J.A. 84. In fact, a shipowner may still be liable for failing to warn of an open and obvious hazard if a stevedore's employee would not be able to work around the hazard. <u>Lincoln</u>, 354 F.3d at 266. Accordingly, we find no abuse of discretion in the district court's denial of the motion for a new trial.

## III.

Like ships passing in the night, plaintiff Bunn, the district court, and the jury, on the one hand, understood this case was principally one of simple negligence, whereas on the other hand, Oldendorff has insisted, here to the very end, that it was solely a failure-to-warn case. For the reasons set forth herein, we reject Oldendorff's assertion and therefore affirm the judgment.

<u>AFFIRMED</u>

31

MOTZ, Circuit Judge, dissenting:

With respect, I dissent. In my view, the focus of the parties on the shipowner's promise, rather than the character of the icy conditions, and the alternatives Bunn had in facing those conditions, left the jury with insufficient evidence to find Oldendorff breached its turnover duty.[1]

I.

At the center of my disagreement with the majority is the question of whether a shipowner's unfulfilled promise to remedy an open and obvious hazard affects its turnover duty.

It is well established that § 905(b) of the Longshore and Harbor Workers' Compensation Act imposes upon a shipowner a narrow turnover duty. See Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 166-67 (1981); Kirksey v. Tonghai Mar., 535 F.3d 388, 391 (5th Cir. 2008). This duty "relates to the condition of the ship upon the commencement of stevedoring operations" and "has two components." Lincoln v. Reksten Mgmt., 354 F.3d 262, 266 (4th Cir. 2003).

---

[1] I agree, for the reasons well stated by the majority, that Oldendorff's appeals of the district court's order denying summary judgment and its jury instructions are not properly before us.

32

First, a shipowner must exercise "ordinary care <u>under the circumstances</u> to have the ship and its equipment in such condition that an <u>expert and experienced stevedore</u> will be able by the exercise of <u>reasonable care</u> to carry on its cargo operations with <u>reasonable safety</u> to persons and property." <u>Scindia</u>, 451 U.S. at 166-67 (emphasis added). This duty is known as the turnover duty of safe condition. <u>See, e.g.</u>, <u>Ludwig v. Pan Ocean Shipping Co.</u>, 941 F.2d 849, 851 (9th Cir. 1991).[2]

As a corollary to the turnover duty of safe condition, a shipowner must also

> warn[] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would <u>not be obvious to or anticipated by</u> him if <u>reasonably competent</u> in the performance of his work.

---

[2] "Although the turnover duty of safe condition is usually framed in terms of stevedores, it is clear that danger to <u>longshore workers</u> is an essential part of the inquiry." <u>Thomas v. Newton Int'l Enters.</u>, 42 F.3d 1266, 1270 n.4 (9th Cir. 1994) (emphasis original). Turning over a ship upon which an expert stevedore can complete its operations with reasonable safety necessarily requires turning over a ship upon which the longshoremen--the stevedore's expert employees who actually perform the operations--can complete their duties with reasonable safety. <u>Id.</u>; <u>accord</u> <u>Kirsch v. Plovidba</u>, 971 F.2d 1026, 1029-30 (3d Cir. 1992). Hence, when determining whether a shipowner has breached its turnover duty of safe condition, "the focus of the factual inquiry is frequently directed at experienced longshore workers"--not just their expert stevedore employer. <u>Thomas</u>, 42 F.3d at 1270 n.4; <u>accord</u> <u>Kirksey</u>, 535 F.3d at 396; <u>Lincoln</u>, 354 F.3d at 266; <u>Kirsch</u>, 971 F.2d at 1029-30.

33

*Scindia*, 451 U.S. at 167 (emphasis added). This duty is known as the turnover duty to warn. *See* *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 99 (1994).

Thus, § 905(b) imposes on a shipowner duties at turnover that are very narrow. *See* *Kirsch v. Plovidba*, 971 F.2d 1026, 1029 (3d Cir. 1992) ("[T]he shipowner's duty is only to provide a workplace where skilled longshore workers can operate safely."); *see also* *Scindia*, 451 U.S. at 170. The turnover duty of safe condition merely requires that a shipowner exercise ordinary care, under the circumstances, to provide an expert and experienced stevedore or longshoreman, who exercises reasonable care, the ability to carry out its operations with reasonable safety. *Scindia*, 451 U.S. at 166-67. The corollary turnover duty to warn requires only that a shipowner exercise ordinary care to provide to a reasonably competent stevedore or longshoreman notice of non-obvious hazards. *Id.* at 167.

Indeed, the openness and obviousness of a hazard to a stevedore provides a shipowner with a complete defense to a turnover duty to warn claim, no matter how unreasonably dangerous the hazard. *See* *Kirksey*, 535 F.3d at 393. The majority errs in asserting that a shipowner has a duty to warn a stevedore of even an open and obvious hazard if the stevedore "is [un]able to conduct . . . operations around [the hazard]

34

safely." Ante at 11, 19-20.  In fact, the Supreme Court has explicitly rejected this view of the turnover duty to warn:

> The duty attaches only to latent hazards, defined as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work.

Howlett, 512 U.S. at 105; see also Ludwig, 941 F.2d at 851 ("The shipowner had no duty to warn Ludwig [the longshoreman] of the hazard.  It was obvious, so its mere presence carried a warning.").

Of course, the openness and obviousness of a hazard does not absolve the shipowner of its turnover duty of safe condition.  See Manuel v. Cameron Offshore Boats, Inc., 103 F.3d 31, 34 (5th Cir. 1997); Kirsch, 971 F.2d at 1029-30; Ludwig, 941 F.2d at 851.  But when a hazard is open and obvious, the shipowner has a diminished turnover duty of safe condition. See, e.g., Kirksey, 535 F.3d at 395-96; Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 409 (3d Cir. 2006); Keller v. United States, 38 F.3d 16, 24 (1st Cir. 1994); Pimental v. LTD Can. Pac. Bul, 965 F.2d 13, 16 (5th Cir. 1992); Ludwig, 941 F.2d at 851-52.

As the Third Circuit has explained, "a shipowner may be negligent for failing to eliminate an [open and] obvious hazard that it could have eliminated . . . only when it should have expected that an expert stevedore [or longshoreman] could not or

35

would not avoid the hazard and conduct cargo operations reasonably safely." Kirsch, 971 F.2d at 1031 (emphasis added).

This standard recognizes that "a shipowner can, ordinarily, reasonably rely on the stevedore [and longshoremen] . . . to notice obvious hazards and to take steps consistent with [their] expertise to avoid those hazards where practical to do so." Id. at 1030; see also Howlett, 512 U.S. at 101; Ludwig, 941 F.2d at 852.[3] An expert and experienced longshoreman can avoid open and obvious hazards in a number of ways, for example by fixing the hazard himself, see Albergo v. Hellenic Lines, Inc., 658 F.2d 66, 69 (2d Cir. 1981), or completing operations while avoiding the hazard, see Bjaranson v. Botelho Shipping Corp., Manila, 873 F.2d 1204, 1208 (9th Cir. 1989); Morris v. Compagnie Mar. Des Chargeurs Reunis, S.A., 832 F.2d 67, 70 (5th Cir. 1987). So long as an expert longshoreman has available such an option, a shipowner cannot be held liable for a breach of its turnover

---

[3] The negligence of a stevedore does not bar an injured longshoreman's recovery from a negligent shipowner. See Woodruff v. United States, 710 F.2d 128, 131-32 & n.7 (4th Cir. 1983). However, a shipowner breaches its turnover duty of safe condition only when an expert stevedore and its expert longshoremen could not through reasonable care carry on operations with reasonable safety. See Scindia, 451 U.S. at 166-67; Kirsch, 971 F.2d at 1029. If, through reasonable care, operations could have been completed with reasonable safety, the inquiry ends there, regardless of how negligent the stevedore has been.

duty of safe condition.  Rather, the shipowner can reasonably rely on the longshoreman to exercise an alternative option.

## II.

The majority largely ignores the above principles. Instead, relying primarily on Lieggi v. Maritime Co. of Philippines, 667 F.2d 324 (2d Cir. 1981) and two similar active operations duty cases, the majority holds that "a shipowner may be liable under the Act for promising, yet failing, to remedy a dangerous condition that injures a longshoreman."  Ante at 12.[4] The case at hand, however, does not concern the active operations duty.  And the logic of the active operations duty does not extend to the turnover duty context.

Contrary to the majority's suggestion, a "stark contrast" exists between the turnover duty and the active operations duty. See Davis v. Portline Transportes Mar. Internacional, 16 F.3d 532, 537 (3d Cir. 1994).  The turnover duty covers the shipowner's conduct before the stevedore's cargo operations have begun, while the active operations duty covers a shipowner's conduct after cargo operations have begun in those areas

---

[4] The active operations duty requires a shipowner after turnover "not to take negligent actions in areas under its control that threaten the longshoremen's safety."  Serbin v. Bora Corp., Ltd., 96 F.3d 66, 70 (3d Cir. 1996); see also Scindia, 451 U.S. at 167.

37

remaining under control of the shipowner. See Scindia, 451 U.S. at 167; Davis, 16 F.3d at 537.

The active operations duty does not rest on whether an expert stevedore and its expert longshoremen could have completed operations with reasonable safety. Instead, that duty rests on whether a shipowner negligently exposes longshoremen to any hazards--even avoidable ones--in areas under the shipowner's control during stevedoring operations. See Serbin v. Bora Corp., Ltd., 96 F.3d 66, 70 (3d Cir. 1996). For this reason, the obviousness of a hazard does not presumptively bar recovery under an active operations duty claim. Id. at 75-76; Pimental, 965 F.2d at 16.

But the obviousness of a hazard does presumptively bar recovery under a turnover duty claim. See Kirksey, 535 F.3d at 395-96; Kirsch, 971 F.2d at 1031; Pimental, 965 F.2d at 16; Ludwig, 941 F.2d at 851-52. And a shipowner's pre-turnover promise to remedy an open and obvious hazard does not itself affect the openness and obviousness of the hazard at turnover. Rather, a shipowner can reasonably rely on an expert stevedore and its expert longshoremen to notice and avoid an open and

38

obvious hazard.  See Kirksey, 535 F.3d at 394; Kirsch, 971 F.2d at 1030.[5]

Moreover, a shipowner's promise to remedy a hazard does not create a duty actionable under § 905(b).  This is so because in the absence of a "contract provision, positive law, or custom to the contrary," all § 905(b) claims must fall under one of the duties identified by the Supreme Court in Scindia.  See 451 U.S. at 172; Kirsch, 971 F.2d at 1031.  An expert and experienced longshoreman cannot, by the mere virtue of a shipowner's promise, shirk his duty to act with reasonable care in the face of an open and obvious hazard.  Holding otherwise raises a promise to the level of a contract, and impermissibly shifts responsibility for longshoreman safety from stevedore (and the longshoreman himself) to shipowner.

As long as an unremedied hazard remains open and obvious, a shipowner's liability to an injured longshoreman is thus extremely limited.  Absent a contract provision, statute, regulation, or custom to the contrary, Scindia, 451 U.S. at 172, the shipowner is liable only to the extent "it should have

---

[5] The case at hand only involves a shipowner's turnover duty regarding open and obvious hazards.  A shipowner's promise to remedy a hazard that is neither known nor open and obvious may affect the manner in which an expert and experienced stevedore reasonably performs its operations.  In short, if a hazard is not open and obvious, a stevedore would have reason to rely on a shipowner's representation that the hazard would be removed.

expected that an expert stevedore [or longshoreman] could not or would not avoid the hazard and conduct cargo operations reasonably safely," Kirsch, 971 F.2d at 1031.

III.

Considering the evidence in the light most favorable to Bunn, and with these legal principles in mind, I cannot agree with the majority's disposition of this appeal.

"[I]n many cases the obviousness of a hazard . . . will be a jury question," Kirsch, 971 F.2d at 1033, and if that were the situation here, I would join the majority in sustaining the jury's verdict. But, both before this court and in the district court, Bunn expressly conceded that "the ice-covered condition of the deck was open and obvious." Resp. Br. at 18; see also Bunn v. Oldendorff Carriers GmbH & Co. K.G., No. 1:10-cv-00255-WMN (D. Md. Nov. 18, 2010), ECF No. 27, at 6. This concession took this important question out of the hands of the jury at trial, and binds us as we consider the proper application of the law on appeal.

Given this concession, the only remaining question is whether the evidence permitted a reasonable jury to conclude that the shipowner, Oldendorff, violated either component of its turnover duty by turning over the ship with open and obvious icy

40

conditions.  It seems to me that the answer to that question is certainly no.

The parties focus on the turnover duty to warn,[6] and the majority extensively discusses that duty, sometimes suggesting that Oldendorff violated it.  See ante at 15-23.  But the majority ultimately characterizes this discussion as "plenty of dicta,"[7] and expressly disavows it as a basis of its holding.  The majority explains that its "affirmance of the judgment is based not on the duty to warn but on the more general turnover

---

[6] Contrary to the majority's suggestion, ante at 15, 30-31, Bunn deserves as much blame as Oldendorff for focusing on the turnover duty to warn.  Both before the district court and on appeal, Bunn did little to prioritize or offer evidence in support of his turnover duty of safe condition claim.

[7] In the course of this dicta, the majority asserts that, although the ice on the ship was open and obvious, the "presence of untreated ice was assuredly not 'open and obvious.'"  Ante at 15.  Howlett, however, cannot be avoided simply by characterizing the ice as "untreated."  This is so because, by definition, ice and untreated ice are the same hazard.  Just as a shipowner's unfulfilled promise to remedy an open and obvious hazard--here icy conditions--does not render the hazard any less open and obvious, so too a shipowner's failure to treat the hazard does not render it any less open and obvious.  Whether one frames the hazard in this case as "ice" or "untreated ice," it remains equally open and obvious, and Howlett forecloses any turnover duty to warn claim.

Later in its own dicta, the majority relies on dicta in Lincoln contending that a shipowner has a duty to warn a stevedore of even open and obvious hazards if the stevedore "is [un]able to conduct . . . operations around [the hazard] safely."  Ante at 19.  But, as noted above, Howlett simply does not permit this conclusion.  For in Howlett the Supreme Court expressly and clearly held that "[t]he duty [to warn] attaches only to latent hazards."  512 U.S. at 105 (emphasis added).

41

duty of safe condition." Ante at 22 (emphasis original); see also ante at 9 ("[L]iability does not depend on the duty to warn."). This disavowal seems appropriate and inevitable given the clear directive of Howlett--that the duty to warn "attaches only to latent [not obvious] hazards." 512 U.S. at 105 (emphasis added).

However, affirmance on the basis of the turnover duty of safe condition--the sole basis for the majority's holding--is not possible because no evidence at trial established a violation of this duty. That is, the jury had insufficient evidence to find that the shipowner, Oldendorff, "should have expected that an expert [longshoreman] could not or would not avoid the hazard [here, icy conditions near hold three] and conduct cargo operations reasonably safely." Kirsch, 971 F.2d at 1031.[8]

Indeed, the only relevant evidence presented to the jury on this critical point suggests that an expert longshoreman, in Bunn's position, might have avoided this open and obvious hazard in several ways. He might have avoided the icy condition near

---

[8] The majority, focusing solely on the unfulfilled promise of the shipowner (by Fediv), effectively ignores this most fundamental inquiry into whether an expert longshoreman could have "by the exercise of reasonable care . . . carr[ied] on [his] cargo operations with reasonable safety to persons and property." Scindia, 451 U.S. at 166-67.

hold three altogether by loading another hold or undertaking another task.  Cf. Burchett v. Cargill, Inc., 48 F.3d 173, 179 (5th Cir. 1995); Bjaranson, 873 F.2d at 1208.  Alternatively, he might have cleared the ice himself, see Pimental, 965 F.2d at 16; Albergo, 658 F.2d at 69, or enlisted a crew member to do so, see Kirsch, 971 F.2d at 1034.  Of course, these options and others may have been unavailable to Bunn, but the record provides no evidence to this effect.

Nor does the record contain any evidence that Bunn was required to finish the job quickly, making him unable to avoid the hazard.  See Teply v. Mobil Oil Corp., 859 F.2d 375, 378 (5th Cir. 1988).  To the contrary, Bunn's shift supervisor provided unrebutted testimony that if a longshoreman encounters a hazardous condition on a ship "[h]e is empowered to shut the operation down."  JA 133.  And another longshoreman, Moxey, did shut down operations when the icy conditions around hold three remained hazardous several hours after Bunn's fall.  JA 92.[9]

---

[9] Bunn does not argue that a "contract provision, positive law, or custom" forms the basis of his § 905(b) claim.  See Scindia, 451 U.S. at 172.  Indeed, by regulation, it is the duty of the stevedore to "eliminate conditions causing slippery walking and working surfaces in immediate areas used by employees."  29 C.F.R. § 1918.91.  Thus, the general principle that a shipowner can reasonably rely on an expert stevedore and its expert longshoremen to notice and avoid an open and obvious hazard applies with full force to this case.  See Kirsch, 971 F.2d at 1030; Ludwig, 941 F.2d at 852.

43

Implicit in the majority's holding may be the view that an expert and experienced longshoreman would be unable to distinguish between treated and untreated ice and so have no reason to pursue another option. This may be so, but the record contains no evidence on this point either.

Of course, as the majority notes, Bunn argues in his briefs that "the lack of treatment with sand and salt in the area where [he] was obliged to work was not open and obvious." See, e.g., Resp. Br. at 18. No evidence, however, supports this argument. Rather, at trial, Bunn himself testified that in well-lit areas of the ship he could distinguish between treated and untreated portions of the deck. JA 178, 226-27. Only in the dark, "very poor[ly]" lit area around hold three was Bunn unable to tell whether the ice had been treated. JA 182-83. Bunn's own testimony therefore supports just one conclusion: that his failure to notice the icy conditions was solely because it was dark, not because treated and untreated ice are indistinguishable. See Resp. Br. at 19 (conceding that "Mr. Bunn . . . had testified . . . that the darkness in the area around No. 3 hatch prevented [him] from discovering that the ice in that area had not been treated.").

But to the extent that darkness constitutes a hazard, it is assuredly obvious, and easily remedied by an expert longshoreman (or indeed anyone with a flashlight). See, e.g., Harris v.

44

Pac.-Gulf Marine, Inc., 967 F. Supp. 158, 164-65 (E.D. Va. 1997); Chapman v. Bizet Shipping, S.A., 936 F. Supp. 982, 986 (S.D. Ga. 1996); Landsem v. Isuzu Motors, Ltd., 534 F. Supp. 448, 451 (D. Or. 1982), aff'd, 711 F.2d 1064 (9th Cir. 1983) (table).   Therefore, darkness provides no basis for a shipowner's liability under its turnover duties.   Nor can darkness render an obvious hazard latent.  Cf. Harris, 967 F. Supp. at 164; Chapman, 936 F. Supp. at 986.   Otherwise the scope of a shipowner's turnover duties on identically hazardous ships could differ depending solely on the time of day when the turnover occurred.[10]

In response to this record evidence and these legal principles, the majority is left to contend that not just poor lighting but also the unfulfilled promise and a purported custom of shipowners removing onboard ice constitute the "totality of the circumstances" that renders Oldendorff liable.  Ante at 24 n.15 (emphasis in original).  But, as explained above, like poor

---

[10] The regulatory scheme governing stevedoring operations supports the conclusion that natural darkness cannot contribute to the latency of a hazardous condition; for it is the stevedore's--not shipowner's--duty to provide an illuminated workspace for cargo operations, and to provide longshoremen with flashlights or other portable lights.  See 29 C.F.R. § 1918.2, .92; see also Scindia, 451 U.S. at 176 ("The statutory duty of the stevedore under [33 U.S.C.] § 941 to provide a safe place to work has been implemented by the Safety and Health Regulations for Longshoring.  29 CFR § 1918.1 et seq.").

lighting, an unfulfilled promise does not render an otherwise obvious hazard latent. See ante at 39. And Bunn has never even argued that custom (rather than the turnover duty) forms the basis for his claim. See ante at 43 n.9. Thus, the record provides no support for the view that the totality of these circumstances barred Oldendorff from reasonably relying on an expert longshoreman in Bunn's position to notice and avoid the obvious icy conditions. See Kirksey, 535 F.3d at 394; Kirsch, 971 F.2d at 1030.[11]

In sum, the record is bereft of evidence that Oldendorff "should have expected that an expert [longshoreman] could not or would not avoid the hazard [here, icy conditions] and conduct cargo operations reasonably safely," Kirsch, 971 F.2d at 1031, and contains considerable evidence suggesting the contrary. Accordingly, the jury lacked an evidentiary basis to find that Oldendorff breached its turnover duty of safe condition.

---

[11] For, as we explained long ago, a shipowner is "entitled to rely on [a stevedore's] judgment as to whether discharge operations could safely be undertaken." Bonds v. Mortensen & Lange, 717 F.2d 123, 127-28 (4th Cir. 1983). There, we reversed a verdict for a longshoreman killed by a crane with a malfunctioning bell on the ground that the hazard was "known to all" and was avoidable. Id. We explained that this is "not a situation . . . in which the longshoremen were precluded from performing their tasks except by a means which was inherently dangerous." Id. at 127-28 & n.5. That logic would seem to require, at the very least, that in this case we vacate the verdict and remand the case for further proceedings, as I propose.

IV.

This is a complex case, made only more so by the parties' failure to develop facts concerning the character of the icy conditions and the alternatives Bunn had in facing those conditions. On the one hand, the record does not provide a legally sufficient evidentiary basis from which a jury could find that Oldendorff breached its turnover duty. On the other hand, the record does not clearly foreclose Oldendorff's possible liability for violating its turnover duty. Rather, the record is simply inadequate to allow a jury to resolve--one way or the other--the dispositive legal question in the case: whether "an expert [longshoreman] could not or would not avoid the hazard and conduct cargo operations reasonably safely." Kirsch, 971 F.2d at 1031.

The Supreme Court has recognized that in limited circumstances "where the court of appeals sets aside the jury's verdict because the evidence was insufficient to send the case to the jury," as I believe it was here, "it is not so clear that the litigation should be terminated." Neely v. Martin K. Eby Const. Co., 386 U.S. 317, 327 (1967). In my view, this is such a case. Accordingly, I would vacate the judgment of the district court and remand the case for a new trial or other proceedings consistent with this opinion. See Fed. R. Civ. P.

50(b); <u>Weisgram v. Marley Co.</u>, 528 U.S. 440, 451-52 (2000); <u>Neely</u>, 386 U.S. at 327-330.