R. STAN BAKER, UNITED STATES DISTRICT JUDGE
This matter is before the Court on Defendant The National Shipping Company of Saudi Arabia's Motion for Summary Judgment. (Doc. 47.) Plaintiffs filed a Response in Opposition, (doc. 52), and Defendant filed a Reply, (doc. 54).[1] In this negligence case, brought under Section 905(b) of the Longshore and Harbor Workers' Compensation Act, Plaintiffs seek to recover for injuries Mr. Frederick Washington suffered while working on Defendant's vessel as a longshoreman in the Port of Savannah. (Doc. 38.) Defendant argues that the undisputed facts show it did not breach any of the duties it owed Mr. Washington and thus summary judgment is warranted. (Doc. 47.)
As the facts show, Mr. Washington narrowly escaped a fatal tragedy on the date in question and suffered injuries stemming from the incident. However, the Longshore and Harbor Workers' Compensation Act does not make the owner of a vessel strictly liable for all injuries occurring on its vessel. While the Court sympathizes with the injuries Mr. Washington suffered, the undisputed facts demonstrate that Defendant is not legally responsible for those injuries. For the reasons set forth more fully below, the Court GRANTS Defendant's Motion for Summary Judgment. (Doc. 47.) The Court DIRECTS the Clerk of Court to enter summary judgment in favor of Defendant and to CLOSE this case.
BACKGROUND
Plaintiffs initially filed this action, in its original form, in the State Court of Chatham County. (Doc. 1-1.) On December 15, 2016, former Defendant NSCSA (America), Inc. removed the case to this Court. (Doc. 1.) In May of 2017, the parties jointly substituted Defendant The National Shipping Company of Saudi Arabia, d/b/a Bahri, (hereinafter Bahri or Defendant) in place of Defendant NSCSA (America), Inc., as Bahri is the correct entity that owned the subject vessel at the time of the incident. (Docs. 12, 13.) Defendant Bahri then filed an unopposed Motion for Joinder of Mini Jolita Washington as a Plaintiff, regarding her potential loss of consortium claim, which the Court granted. (Docs. 28-30.) Thereafter, Plaintiffs filed a Second Amended and Recast Complaint ("Second Amended Complaint") alleging negligence and loss of consortium against Defendant Bahri.[2] (Doc. 38.)
*1344 Plaintiffs bring their action under the Savings to Suitors clause of 28 U.S.C. § 1333, the admiralty jurisdiction statute. (Doc. 38, p. 2). "[T]he savings-to-suitors clause [of the admiralty jurisdiction statute] provides a plaintiff in a maritime case alleging an in personam claim with three options: (1) the plaintiff may file suit in federal court under admiralty jurisdiction; (2) the plaintiff may file suit in federal court under diversity jurisdiction; or (3) the plaintiff may file suit in state court." St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc., 561 F.3d 1181, 1194 n.5 (11th Cir. 2009) (citations omitted) ); see also Russell v. Atl. & Gulf Stevedores, 625 F.2d 71, 72 (5th Cir. 1980) (holding that § 905(b) of the Longshore Act does not provide federal question jurisdiction); Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981); Salty Dawg Expedition, Inc. v. Borland, 301 F.Supp.3d 1189, 1191 (M.D. Fla. 2017) ("The decisions consistently interpret the saving-to-suitors clause to preserve the right to a jury trial if the plaintiff in an admiralty dispute successfully invokes a jurisdiction other than admiralty (for example, diversity or federal question)."). Plaintiffs case was removed to this Court based on diversity jurisdiction. (Doc. 1.) Additionally, although the Second Amended Complaint does not explicitly invoke the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. ("the Longshore Act"), it is undisputed that this action is governed by the Longshore Act, specifically Section 905(b) thereof, since it is premised upon injuries Plaintiff Frederick Washington ("Mr. Washington" or "Plaintiff") suffered while working on the M/V BAHRI HOFUF, a foreign-flag vessel owned and controlled by Defendant Bahri.[3] (See Docs. 47, 52, 54.)
On the day of the incident, August 1, 2016, a loaded trailer uncoupled from the tractor pulling it during discharge, rolled back down an internal ramp of the vessel, and caused Mr. Washington to injure his knee and shoulder as he moved out of the way of the oncoming trailer. (Doc. 52-1, pp. 8-9.) Mr. Washington, a member of the International Longshoremen's Association Local 1414 since 2013, was employed as a longshoreman by non-party SSA Stevedores ("SSA") that day.[4] (Doc. 52-1, pp. 1-3.) As a longshoreman working for SSA, Mr. Washington assists in the process of loading and discharging cargo from ships that call the Port of Savannah. (Id. ) Bahri engages SSA to carry out the actual loading and discharging of cargo from its vessels when they are in the Port of Savannah. (Id. ) The vessel at issue here, the BAHRI HOFUF, is a "Roll-On/Roll-Off" vessel ("RO/RO") that allows cargo to be moved on and off the ship via wheeled *1345 conveyances using the vessel's stern ramp. (Id. )
On August 1, 2016, the BAHRI HOFUF called at the Port of Savannah to load and unload large steel coils, and Mr. Washington was one the of longshoremen hired by SSA to assist with cargo operations that day. (Id. at pp. 3-4.) Mr. Washington worked as a flagman along with two to four others and their "gang" header, Joseph Williams. (Id. ) Working alongside Mr. Washington's gang were Robert Manning, a Terberg tractor operator, Charles Hills, a forklift operator, as well as stevedores Daniel Sheppard and Kevin Dotson, who acted as supervisors for SSA during this operation. (Id. ) To offload the coils from the BAHRI HOFUF, "SSA, with input from the shipping line, determined that the coils would be discharged via MAFI trailer using powered equipment to pull [the] loaded MAFI."[5] (Id. at p. 2 (quoting Dotson's Deposition, (doc. 36-2, p. 26).) This plan called for "pulling [the ship's] MAFI trailer with steel coils on top of it using the Terberg [T]ugmaster [tractor] from the ship," and was approved by SSA Supervisor Dotson.[6] (Doc. 36-2, p. 28; see doc. 40-1, pp. 87-89.) The steel coils were loaded onto the flatbed MAFI trailer and then pulled off the vessel by a Terberg tractor, which was attached to the MAFI trailer by a "gooseneck" connector. (Doc. 52-1, pp. 4, 7.)
This connection hitch includes a "lip" on the Terberg that slides into the MAFI's "gooseneck tunnel" and over an internal connecting piece at the end of the tunnel, as well as two brackets, one on each side of the gooseneck lip, that fit into sockets on the sides of the gooseneck tunnel's entryway. (Doc. 47-1, pp. 4-6.) The MAFI trailer and Terberg tractor provided by Defendant Bahri, however, lacked their own safety chains and also lacked mounts to connect any other safety chains.[7] (Id.; doc. 41-3, p. 74; see also doc. 36-2, p. 31; doc. 40-1, p. 29.) In addition to the MAFI trailer-Terberg tractor combination provided by Bahri, the cargo operation that day also utilized an SSA-provided TICO truck equipped with a fixed MAFI attachment, rather than a detachable gooseneck, to connect and pull a second MAFI trailer off the vessel.[8] (Doc. 52-1, pp. 6-7; doc. 36-2, pp. 40-42.) Because this fixed attachment mechanism is "all one piece," the TICO truck does not utilize safety chains when pulling MAFI trailers. (Id. ) Although the BAHRI HOFUF's MAFI trailer and Terberg tractor lacked safety chains, SSA
*1346 policy dictates they be used where available when offloading cargo with this method. (Doc. 36-2, p. 36.)
Mr. Manning, the driver of the Terberg tractor and MAFI trailer in question, testified that he was trained to "[a]lways use safety chains" with this combination of equipment. (Doc. 41-3, p. 74.) Other longshoremen echoed Mr. Manning's statement that safety chains are used with Terberg trucks. (Doc. 36-3, p. 59; doc. 36-7, p. 62.) Furthermore, while OSHA regulations and the MAFI trailer operating manual do not require safety chains, the gooseneck operating manual states that "rolltrailers" (such as the MAFI in question) connected with goosenecks "should [preferably] be equipped with safety hooks beside the coupling mouth for increased safety."[9] (Doc. 46-1, pp. 87-88, 94, 152.) The manual also expressly warns of the heightened "[r]isk of unintended uncoupling of rolltrailers" on slopes. (Id. at p. 151.) However, on the day in question, Mr. Manning went ahead and used the BAHRI HOFUF's Terberg tractor and MAFI trailer without safety chains, because:
this particular Terberg didn't even have [any] mountings for anything because, see, they didn't have anything on any side. It didn't have any chains where you can mount [safety chains] and can use them. So I said this thing don't have any-so I thought it was something that was designed that way, you know.
(Doc. 41-3, p. 74.) Mr. Manning raised this concern about the lack of safety chains to Supervisor Dotson but "was informed by the stevedores and everybody else that it's fine to use this [particular] piece of equipment." (Id. at pp. 21, 41.) Unlike Mr. Manning and Supervisor Dotson, Mr. Washington was not aware that Bahri's Terberg tractor and MAFI trailer lacked safety chains. (Doc. 36-7, pp. 86-87.)
Prior to the incident, Supervisor Dotson did not notice any readily-visible unsafe conditions with regard to the Bahri-owned equipment, but he admitted that he did not undertake any inspection to determine whether the equipment was safe for its intended purpose.[10] (Doc. 36-2, pp. 24-25.) Rather, Supervisor Dotson "assumed" it was safe since the equipment was familiar. (Id. )
Although the record is unclear as to precisely when the incident occurred, it is undisputed that during the time in question Mr. Washington was working as a flagman in the bottom hold in the BAHRI HOFUF's bow. (Doc. 52-1, p. 8; doc. 52, p. 2.) In Mr. Washington's flagman gang, headed by Joseph Williams, were two to four other flagmen; their primary responsibility was to "flag [ ] in" (with hand signals) the Terberg tractor pulling the empty MAFI trailer and "line him up, stop him, stage him, put the chocks on the coils[,] ... flag them back out, flag the forklift in, tell them when to stop, how far *1347 to come on the trailer, all of that." (Doc. 36-7, pp. 54-55, 69-70, 73-74.) The MAFI trailer at issue was loaded with three heavy steel coils and was being pulled by the Terberg tractor driven by Mr. Manning. (Id. at pp. 76, 84.) This offload method had been successfully used multiple times that day before the subject incident occurred.[11] (Doc. 36-2, pp. 35, 38; see also doc. 40-1, p. 81; doc. 41-3, p. 21.)
After the last coil was placed onto the MAFI trailer, Mr. Washington signaled to Mr. Manning that he could proceed and Mr. Manning began pulling the loaded MAFI trailer up the vessel's ramp toward the dock. (Doc. 36-7, pp. 80-81.) Mr. Washington remained standing in the same area of the vessel's bow, at the bottom of the ramp, awaiting the next truck and trailer. (Id. at pp. 81-82.) Less than two minutes later, for reasons unknown, the just-loaded MAFI trailer uncoupled from the Terberg tractor at the top of the ramp, nearly four stories up, and came crashing back down the ramp toward Mr. Washington in the hold.[12] (Id. at pp. 80, 82-84; see also doc. 52-1, pp. 8-9.) The MAFI trailer, carrying sixty tons of cargo, was "jumping" down the ramp with sparks flying and "shaking the whole ship." (Doc. 36-7, pp. 87-88.) As the MAFI trailer approached Mr. Washington, he tried to evade its path by stepping out of the way, but the trailer then "jackknifed" straight toward him, causing him to turn and flee. (Id. at pp. 88-89.) Charles Hills, a forklift driver in the area, saw the oncoming trailer and maneuvered his massive forklift in between it, a pole, and Mr. Washington to stop the trailer's momentum. (Id.; doc. 36-3, pp. 28, 31-32, 38-39, 62.) Mr. Washington recalls being hit on the side, and almost falling down, before injuring himself as he jumped to safety on pipes located behind Mr. Hills's forklift. (Doc. 36-7, pp. 89-90; see also doc. 36-3, pp. 33, 41.) Mr. Hills characterized this as a "life and death situation" that Mr. Washington got the worst of because he jumped hard and hit his shoulder while, quite literally, running for his life. (Doc. 36-3, pp. 31, 28-29, 61-62.) Immediately after the incident, Mr. Washington told Mr. Hills that his knee was injured, and he was observed walking with a limp. (Id. at 49, 62-63.) At the time, Mr. Washington thought he had sprained his knee and bruised his shoulder. (Doc. 36-7, p. 104.) Thirty days later, on August 30, 2016, he reported his injuries to SSA's safety director. (Doc. 36-1, pp. 6, 8-11.)
While the precise cause of the uncoupling incident seems to be ultimately unknowable, the evidence shows that safety chains would have more than likely prevented the uncoupled MAFI trailer from crashing back down the BAHRI HOFUF's ramp. Defendant's Port Captain, Poul Mollerup-Madsen, nonetheless points to operational error as the cause. (Doc. 40-1, pp. 36-37.) According to him, if the Terberg tractor and MAFI trailer are correctly connected via the gooseneck hitch and are properly operated, then "the trailer can absolutely not detach" because there are two locking mechanisms on the gooseneck-the internal lip and the side brackets. (Id. ) Thus, Captain Madsen posits three possible explanations: (1) the MAFI trailer was incorrectly loaded down in the *1348 hold causing it to tilt and detach while going up the internal, incline ramp; (2) the MAFI trailer and Terberg tractor were improperly and incompletely attached via the gooseneck; or (3) the MAFI trailer's fifth wheel was not raised high enough as the Terberg tractor pulling it crested the top of the incline ramp.[13] (Id. at pp. 37-41.) Captain Madsen concluded that the use of safety chains "maybe" would have avoided this accident, but he was unsure because he had never before seen a MAFI detachment in his ten years with Bahri. (Doc. 40-1, pp. 19-20, 41.)
However, Mr. Manning, who had witnessed a MAFI uncouple from a tractor before, testified positively that safety chains would have avoided this incident, (doc. 41-3, pp. 21-22, 29-30, 32-33, 42, 66), as did Mr. Hills, (doc. 36-3, p. 23). Plaintiffs' expert, Mr. Milam, also concluded that safety chains "would have prevented this incident" and that best practices dictated the use of safety chains during the at-issue discharging operation. (Doc. 46-1, p. 142.) In addition, Supervisor Dotson, who too had witnessed prior MAFI breakaways, opined that in hindsight he considered the TICO truck with a fixed MAFI attachment to be safer than the Bahri equipment. (Doc. 36-2, pp. 35-36, 42.) Following the incident, in order to finish discharging the steel coils, SSA substituted other conveyance equipment in place of Bahri's safety-chainless tractor and trailer.[14] (Doc. 36-2, pp. 40-41; doc. 36-3, pp. 46, 59.)
STANDARD OF REVIEW
Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.
The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). If the moving party discharges *1349 this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257, 106 S.Ct. 2505.
In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007) ). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted).
DISCUSSION
Plaintiffs' suit is based upon § 905(b) of the Longshore Act, which provides longshoremen a cause of action against a vessel for injuries caused to them by the vessel's negligence. Under the Longshore Act, a vessel owes longshoremen three general but limited duties: (1) the "turnover duty" of safe condition and its corollary duty to warn the stevedore of hidden dangers of which it knows or should know; (2) the "active control duty" to exercise reasonable care to prevent injuries in areas that the vessel retains control over once stevedoring operations have begun; and (3) the "duty to intervene" in the stevedore's operations when the vessel owner has actual knowledge of a hazard of which the stevedore cannot be relied upon to remedy. See Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98-100, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994) ; Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 167-76, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) ; see also Roach v. M/V Aqua Grace, 857 F.2d 1575, 1581 (11th Cir. 1988). These three duties, collectively known as the Scindia duties, apply "to the employment of independent harbor contractors and their maritime employees." M/V Aqua Grace, 857 F.2d at 1581-82 (citation omitted). However, "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." Scindia, 451 U.S. at 170, 101 S.Ct. 1614.
Plaintiffs allege Defendant breached its duties to Mr. Washington by failing to exercise reasonable care to ensure that it "provided equipment safe and fit for its intended use" and by failing to "provide safety equipment" to prevent a MAFI detachment. (Doc. 38, p. 5.) Moreover, Plaintiffs contend that Defendant knew or should have known "there was an unsafe risk that the [MAFI] cargo trailer system could detach if not properly secured, maintained[,] and inspected." (Id. ) Plaintiffs asset that Defendant was negligent in its "failure to warn" Mr. Washington of the unsafe trailer, and its "failure to properly train" its crew regarding MAFI trailer systems, and in its "failure to maintain" its trailers in safe condition. (Id. at pp. 5-6.)
Defendant Bahri moves for summary judgment as to Plaintiffs' negligence claim and the derivative loss of consortium claim,[15] arguing that it did not violate any *1350 of the Scindia duties owed to Mr. Washington under Section 905(b) of the Longshore Act and thus summary judgment should be entered in its favor. (Doc. 47-1, pp. 7-18.) Specifically, Bahri contends that the undisputed facts demonstrate that it did not violate the turnover duty, the active control duty, or the duty to intervene when it provided SSA the Terberg tractor and MAFI trailer without safety chains, and that such condition was open and obvious as it relates to the turnover duty. (Id. at pp. 7-14; see also doc. 54.) Bahri also contends that any fault for the incident falls on the stevedoring company, SSA, as it has the primary responsibility to ensure a safe working environment for offloading operations and Bahri is entitled to rely on its expertise. (Doc. 47-1, pp. 14-18.)
In response, Plaintiffs assert that questions of fact remain as to each of the Scindia duties, all three of which Plaintiff alleges Defendant violated, and as to whether the danger posed by not having safety chains was open and obvious. (Doc. 52, pp. 10-16.) Plaintiffs proceed as though the open and obvious defense does not apply to the turnover duty of safe condition and argue that it does not defeat their claim for violation of the turnover duty to warn claim. (Id. ) As such, Plaintiffs contend Defendant's summary judgment motion should be denied. (Id. ) In its Reply, Defendant argues that Plaintiff fails at each turn to point to record evidence sufficient to support its claims and to create a genuine dispute of material fact. (Doc. 54.) Defendant also reiterates its contention that the open and obvious defense applies to both of Plaintiffs' turnover duty claims-warning and safe condition-and bars each in this case. (Id. at pp. 2-3.)
The fundamental issue in this case is relatively straightforward: Did Defendant violate one or more of the three duties it owed Mr. Washington when it provided offloading equipment without safety chains or mounts to discharge large steel coils from the BAHRI HOFUF? As laid out above, the facts salient to answering this question are not in dispute. In reviewing these facts and the applicable law under the Longshore Act, the Court finds Defendant Bahri's Motion for Summary Judgment is due to be granted for the reasons explained below.
I. The Turnover Duty
In Howlett v. Birkdale Shipping Co., the United States Supreme Court expounded on the contours of the duty to turn over a reasonably safe ship as follows:
A vessel must exercise ordinary care under the circumstances to turn over the ship and its equipment and appliances in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service of otherwise, will be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property.
Howlett, 512 U.S. at 98, 114 S.Ct. 2057 (citation and internal quotations omitted). The Howlett Court also elucidated a vessel owner's duty to warn:
A corollary to the turnover duty requires the vessel to warn the stevedore of any hazards on the ship or with respect to its equipment, so long as the hazards are known to the vessel or should be known to it in the exercise of reasonable care, and would likely be encountered by the stevedore in the course of his cargo operations, are not known by the stevedore, and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.
Id. at 98-99, 114 S.Ct. 2057 (citation and internal quotations omitted).
*1351 Stated concisely, under these twin duties, "[b]efore a stevedore begins work, a shipowner must turn over the ship and its equipment in a condition that permits a stevedore to do its work with reasonable safety, and must warn the stevedore of any hidden dangers of which it knows or should know." M/V Aqua Grace, 857 F.2d at 1581 (citation omitted). "The duty to warn, however, is narrow. It does not include dangers which are either (1) open and obvious, or (2) which a reasonable competent contractor should anticipate encountering." In re Knudsen, 710 F.Supp.2d 1252, 1274 (S.D. Ala. 2010). Nevertheless, "[t]hat a shipowner generally need not warn of open and obvious dangers does not negate the shipowner's duty to exercise ordinary care under the circumstances to ensure that the ship is in a reasonably safe condition." Bunn v. Oldendorff Carriers GmbH & Co. KG, 723 F.3d 454, 463 (4th Cir. 2013) (emphasis in original).
Plaintiffs allege that Bahri failed to turn over reasonably safe equipment and that it failed to warn of the hazardous condition posed by the lack of safety chains on the Terberg tractor and MAFI trailer it provided. (Doc. 52, pp. 9-14.) Particularly, Plaintiffs contend that, "[e]ven with the exercise of ordinary care, without safety chains connecting the equipment, cargo operations" could not be carried on with reasonable safety, (id. at p. 12), and that issues of fact remain as to whether the of the lack of safety chains was open and obvious, (id. at p. 13). Defendant argues the safety chain issue was open and obvious, which precludes liability as to both the turnover duty of safe condition and the turnover duty to warn. (Doc. 47-1, pp. 9-11; doc. 54, pp. 2-3.) Defendant further avers that it was entitled to rely on the stevedore's expertise in ensuring a safe offloading environment for the longshoremen under its employ. (Doc. 47-1, pp. 8-9, 14-16.)
A. The Open and Obvious Defense
As an initial matter, the Court considers whether the open and obvious defense applies to the duty to turn over the ship's equipment in a condition that allows a stevedore to carry out his job obligations with reasonable safety. In support of its contention that this defense applies here, Bahri relies solely on Kirksey v. Tonghai Maritime, a non-controlling case from a sister circuit which extended the open and obvious defense to the duty to turn over a safe ship.[16] 535 F.3d 388, 394-95 (5th Cir. 2008). The Fifth Circuit Court of Appeals reasoned that, under the Howlett Court's limitation of the duty to warn to only "latent " dangers, "it makes no sense to say that the vessel is nevertheless liable to the longshoremen for breach of the duty to turnover a safe ship based on an obvious defect against which it had no duty to warn." Id. at 95, 114 S.Ct. 2057 (emphases in original).
*1352 While this reasoning has appeal, it sidesteps the clear distinction drawn by the Supreme Court in Howlett between the turnover duty of safe condition and its corollary duty to warn. The Fourth Circuit Court of Appeals aptly expounded upon this distinction: "After all, the duty to warn is a mere corollary to the turnover duty, not the sole manner of measuring the reasonableness of a shipowner's actions upon turnover.... In other words, failure to warn of a latent hazard is but one way a shipowner may violate its turnover duty[.]" Oldendorff Carriers, 723 F.3d at 463 (citation omitted). "[T]he openness and obviousness of a hazard does not absolve the shipowner of its turnover duty of safe condition.... But when a hazard is open and obvious, the shipowner has a diminished turnover duty of safe condition." Id. at 471 (Motz, J., dissenting) (citations omitted). As the Third Circuit Court of Appeals has explained, "a shipowner may be negligent for failing to eliminate an [open and] obvious hazard that it could have eliminated ... when it should have expected that an expert stevedore could not or would not avoid the hazard and conduct cargo operations reasonably safely."[17] Kirsch v. Plovidba, 971 F.2d 1026, 1031 (3d Cir. 1992). Thus, while the openness and obviousness of a given hazard is not a complete bar or defense to recovery under the turnover duty of safe condition, as it is under the corollary duty to warn, it is a consideration to be taken into account when looking to the circumstances of the alleged negligence and whether the vessel exercised ordinary care. See Oldendorff Carriers, 723 F.3d at 463 ; Kirsch, 971 F.2d at 1030-31 ; see also Martinez v. Korea Shipping Corp., 903 F.2d 606, 610 (9th Cir. 1990) ("Under Scindia, the obviousness of the defect does not absolve the vessel owner of its duty to turn over the ship in a condition under which expert and experience[d] stevedores can operate safely.").
B. Whether Bahri Violated the Turnover Duty of Safe Condition
The central question here as it relates to the turnover duty of safe condition is therefore whether, under the circumstances, Bahri turned over its equipment in a condition under which SSA could do its work with reasonable safety. See M/V Aqua Grace, 857 F.2d at 1581. Plaintiff must adduce facts sufficient to allow a jury to find that Bahri failed to exercise reasonable care, under the circumstances, when it turned over the Terberg tractor and MAFI trailer without safety chains or mounts to the expert stevedoring contractor, SSA, which approved their use in cargo operations. See Howlett, 512 U.S. at 98, 114 S.Ct. 2057. However, the vessel is not liable for injuries that "could be anticipated and prevented by a competent stevedore." Id. at 97, 114 S.Ct. 2057. In considering the circumstances surrounding Bahri's turnover of the Terberg tractor and MAFI trailer, the Court finds summary judgment is warranted on Plaintiffs' turnover duty of safe condition claim.
*1353 At the time Bahri provided the equipment to SSA, it was known by both entities that the tractor and trailer lacked safety chains. (See, e.g., Doc. 52, p. 12 ("It is clear that Defendant Bahri knew that the equipment lacked safety chains.").) To wit, Mr. Manning specifically raised his concerns over the lack of safety chains to Supervisor Dotson, who informed him that using Bahri's Terberg tractor and MAFI trailer without safety chains was permissible. (Doc. 41-3, pp. 21, 41.) SSA had used this equipment of Bahri's "many times" in the same manner without incident. (Doc. 36-2, p. 25.) SSA had also regularly, and safely, used Terberg and gooseneck equipment provided by other RO/RO vessels without safety chains. (Id. at p. 32.) Likewise, Bahri's Terberg, gooseneck, and MAFI combination had been utilized in cargo operations for ten years without an uncoupling incident. (Doc. 40-1, pp. 19-20, 41.) On the day in question, SSA had safely used Bahri's equipment to offload much of the steel coil cargo prior to the uncoupling. (Id. at pp. 81-82; doc. 41-3, p. 34.)
Moreover, Supervisor Dotson testified that, while he did not make any specific inspection, (doc. 36-2, p. 24), he determined that Bahri's equipment was fit for its intended use despite not having, or providing for the use of, safety chains:
Q. Are there uses of Terberg and MAFI combinations that can be done safely without the use of safety chains?
A. Yes. And-
Q. Did you want to-okay. So in your opinion at the time that the BAHRI HOFUF and its equipment was turned over to SSA to you for use in the discharge of these steel coils using the MAFIs, was it your opinion that the equipment could be used safely in the condition they were tendered to SSA?
A. Yes.
Q. All right. And that's for the intended purpose of discharging these steel coils.
A. Correct.
(Id. at p. 32.) He testified that he would have rejected the operation had he felt it unsafe. (Id. at p. 28.) Furthermore, the contract between SSA and Bahri gave SSA the "sole discretion" to use the vessel's cargo handling equipment and prohibited the use of equipment determined to be "unsuitable" by SSA. (Doc. 40-1, p. 145.) Under SSA's own policy in place at that time, safety chains were only required to be used in conjunction with MAFI trailers where available, and there was no parallel rule to avoid using equipment that lacked safety chains. (Doc. 36-2, p. 36.) Lastly, neither OSHA regulations,[18] nor the gooseneck manual, nor Bahri's MAFI lease agreement-which spells out certain operational terms-mandates the use of safety chains on this equipment. (Doc. 46-1, pp. 87, 91-94, 99, 149-58, 161-76.)
Against these facts, Plaintiffs point to the testimony of their expert Mr. Milam. (Doc. 52, pp. 11-12.) Mr. Milam opined that Bahri, as the supplier of the at-issue Terberg tractor and MAFI trailer, had a "general duty" to provide that equipment in a safe manner. (Doc. 46-1, pp. 101-02.) Mr. Milam also considered it to be "best practices" to use safety chains as a "secondary emergency system to prevent the accidental disconnect" of a MAFI trailer, *1354 especially in light of the incline ramps. (Id. at p. 103.) Plaintiffs also contend that safety chains should have been used because trailer uncoupling events are known to have occurred at the Port of Savannah. (Doc. 52, p. 12.) Finally, Plaintiffs argue that because the undisputed facts show there were no safety chains or chain mounts affixed to the equipment provided by Bahri, cargo operations could not have been carried on with reasonable safety, even with the exercise of ordinary care. (Id. )
When Congress amended the Longshore Act in 1972, it provided longshoremen "with no-fault workers' compensation claims (against their employer, § 904(b) ) and negligence claims (against the vessel, § 905(b) ) for injury and death." Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 818, 121 S.Ct. 1927, 150 L.Ed.2d 34 (2001). All other claims against a vessel were expressly preempted. Id. Consequently, the duties a vessel owes a longshoreman working on its decks and within its holds are confined to those arising under § 905(b) jurisprudence. "As the Supreme Court and [the Eleventh] Circuit have explained, the [Longshore] Act imposes limited duties on a ship owner," those being the three duties outlined in Scindia. Horton v. Maersk Line, Ltd., 603 F. App'x 791, 796 (11th Cir. 2015) (per curiam). There is no additional "general duty" or "best practices" standard to which vessels and their shipowners are held. See Sinagra v. Atl. Ocean Shipping, Ltd., 182 F.Supp.2d 294, 300 (E.D.N.Y. 2001) (no duty to turn over "absolutely safe vessel"). Moreover, § 905(b) "d[oes] not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship." Scindia, 451 U.S. at 170, 101 S.Ct. 1614. Thus, as it relates here, Bahri did not have a general duty of best practices with regard to the turnover of its equipment to SSA, but rather it only had to "exercise ordinary care under the circumstances" to furnish the Terberg and MAFI in such a condition that SSA would "be able by the exercise of ordinary care to carry on cargo operations with reasonable safety to persons and property." Howlett, 512 U.S. at 98, 114 S.Ct. 2057 (citation and internal quotations omitted).
Looking to all the circumstances of that fateful day, as laid out by the undisputed facts above, the Court finds that, as a matter of law, Bahri did not violate its turnover duty of safe condition when it provided SSA with a Terberg tractor and MAFI trailer that lacked safety chains. "[A] breach of the turnover duty must occur at the moment of turnover." Robie v. S. Marine Const. Co., No. CIV.A. 10-7-DLB-CJS, 2013 WL 188577, at *10 (E.D. Ky. Jan. 17, 2013) ; see also, e.g., Howlett, 512 U.S. at 98, 114 S.Ct. 2057 (turnover duty concerns condition of equipment at "the commencement of stevedoring operations"). Here, at the moment of turnover, the MAFI and Terberg did not have safety chains (and they remained in this condition up to and through the time of the incident). Given there is no dispute that Bahri's equipment had been safely utilized in the same condition (without safety chains) for a significant amount of time prior to the uncoupling incident,[19] the *1355 equipment was furnished "in a condition that permit[ted the] stevedore to do its work with reasonable safety." M/V Aqua Grace, 857 F.2d at 1581. Because this duty is breached, if at all, at the moment Bahri turned over the subject equipment, these undisputed facts show that Bahri did not breach the turnover duty. Whatever operational deficiency caused the MAFI to uncouple, it and the Terberg were otherwise in the same "condition" at the moment of the incident as they were at the moment of turnover-without safety chains or mounts. Thus, while safety chains may have prevented the consequences of the uncoupling (that is, the MAFI becoming fully detached from the trailer and rolling back down the ramp toward Mr. Washington), the lack of chains did not render Bahri's equipment inherently incapable of being used with "reasonable safety" by SSA and its longshoremen. Stated differently, Defendant turned over its conveyance equipment in such a condition that the longshoremen could unload the vessel with reasonable safety.
Other circumstances surrounding the incident confirm this conclusion: SSA had safely used Bahri's Terberg and MAFI many times in the past without safety chains; Bahri had safely used this equipment in other ports without safety chains; SSA had safely used Terbergs and goosenecks without safety chains from other RO/RO vessels; Mr. Manning notified Supervisor Dotson before cargo operations began about his concern over the lack of safety chains but was told the equipment was safe to use; SSA approved this equipment's use knowing it lacked safety chains and with full authority to halt operations to substitute other, safety-chained equipment if it so chose; and Captain Madsen had never before had a MAFI uncoupling incident on his vessel. Even if Bahri should have known that MAFIs had uncoupled at the Port of Savannah at least several times before, it was still entitled to rely on SSA's expertise and local experience to safely offload the steel coils. See, e.g. Hill v. Texaco, Inc., 674 F.2d 447, 451 (5th Cir. 1982) ("In discharging [the turnover] duty the ship may rely on the stevedore's performing its task with reasonable care."). Furthermore, SSA had complete contractual authority over whether and how to use any equipment provided by Bahri, yet Supervisor Dotson, exercising his expertise, determined the Terberg and MAFI were safe to use even despite knowing that prior uncoupling incidents had occurred at the Port of Savannah. Lastly, Plaintiffs point to no authority which affirmatively requires the use of safety chains on this equipment.
Although the Court does not doubt that the use of safety chains may have ultimately avoided this incident, "it is essential to apprehend that the primary responsibility for the safety of [longshoremen] rests with the stevedoring contractor." Gable v. Klaipeda Transp. Fleet, Ltd., No. CIVA1:04CV581WJG-JMR, 2006 WL 1972238, at *4 (S.D. Miss. July 12, 2006)
*1356 (citation omitted). Bahri owed Mr. Washington a limited duty to exercise reasonable care under the circumstances in turning over reasonably safe equipment to SSA, a duty which it discharged based on the undisputed facts in this case. As explained above, to visit liability upon a vessel under the turnover duty, it is not enough to point toward a hazardous condition. Plaintiffs must also introduce evidence showing the hazard was such that SSA could not carry out its operations with reasonable safety to persons and property through the exercise of ordinary care. Plaintiffs have failed to do so here. For all of the foregoing reasons, based on the undisputed facts, the Court finds as a matter of law that Defendant Bahri did not violate its turnover duty of safe condition.
C. Whether Bahri Violated the Turnover Duty to Warn
To establish a turnover duty to warn claim, Plaintiffs must demonstrate that Defendant Bahri had knowledge of the hazardous condition and that the condition was not open and obvious. Howlett, 512 U.S. at 95, 114 S.Ct. 2057. The duty to warn "is confined to latent hazards, that are 'known to the vessel or should be known to it in the exercise of reasonable care.' " Id. at 99-100, 114 S.Ct. 2057 (quoting Scindia, 451 U.S. at 167, 101 S.Ct. 1614 ). Moreover, a vessel need not warn of hazards that would be "obvious to [or] anticipated by a competent stevedore in the ordinary course of cargo operations." Id. at 99, 114 S.Ct. 2057. Thus, the turnover duty to warn does not generally apply to "dangers which are either (1) open and obvious, or (2) which a reasonable competent contractor should anticipate encountering."[20] In re Knudsen, 710 F.Supp.2d at 1274.
Defendant contends the lack of safety chains or mounts was open and obvious, which precludes liability. (Doc. 47-1, pp. 9-11.) Plaintiffs, however, argue that the safety chain issue was not open and obvious, even though Mr. Manning alerted Supervisor Dotson about it, because Mr. Manning believed the lack of chains was by design due to Bahri's equipment also lacking chain mounts. (Doc. 52, pp. 12-13.) The undisputed facts show that the lack of safety chains on Bahri's Terberg tractor and MAFI trailer was a readily-visible condition known to SSA and its longshoreman driver. Plaintiffs essentially admit that the lack of safety chains or mounts was open and obvious: "It is clear from the evidence in the record that Bahri was aware that the equipment it lent to SSA did not have safety chains.... Moreover, Mr. Manning testified that the equipment did not have mountings or anything on the side for the use of safety chains." (Id. )
The Court recognizes that whether a hazard is open and obvious for the purposes of asserting a defense to liability is not as simple as whether the hazard can be seen by those in its vicinity. See Green v. United States, 418 F. App'x 862, 869 (11th Cir. 2011) (per curiam) ("Knowledge that a condition exists does not imply knowledge that the condition is dangerous." (citation and alterations omitted) ). In this case, *1357 however, the danger posed by not having safety chains-an unintended uncoupling and complete trailer detachment-was also known. In fact, this was the concern motivating Mr. Manning to alert Supervisor Dotson about the lack of chains. (See Doc. 41-3, p. 21.) Despite being alerted to this concern and knowing of prior incidents where trailers became uncoupled, Supervisor Dotson still felt Bahri's equipment was safe to use, and indeed it was for most of the steel coil discharge: "All day long it was functioning fine.... There was nothing wrong with it. [Except] that particular trip...." (Id. )
Thus, even looking to the danger posed by the lack of chains, rather than simply their absence, the potential hazard of an uncoupling was open and obvious. See Troutman, 2019 WL 656259, at *4, 2019 U.S. Dist. LEXIS 4132, at *10 (danger of open walkway open and obvious); In re Knudsen, 710 F.Supp.2d at 1273-74 (lack of ropes, chains, or guardrails open and obvious). Accordingly, the Court finds Bahri did not breach the turnover duty to warn because a reasonably jury could not conclude, based on the undisputed facts, that the danger posed by the lack of safety chains or mounts was not open and obvious to those working on the BAHRI HOFUF.
II. The Active Control Duty
After the vessel and its equipment have been turned over, and once stevedoring operations have begun, the active control duty "provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel." Howlett, 512 U.S. at 98, 114 S.Ct. 2057 (citation and internal quotations omitted). A vessel may be liable under the active control duty "if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167, 101 S.Ct. 1614. Thus, to state an active control duty claim, a plaintiff must show that the vessel owner "substantially controlled or [was] in charge of (i) the area in which the hazard exist[ed], (ii) the instrumentality which caused the injury, or (iii) the specific activities the [harbor contractor] undertook." Ross v. United States, No. 3:10-CV-496-J-37-JBT, 2012 WL 523631, at *6 (M.D. Fla. Feb. 16, 2012) (third alteration in original) (citations omitted).
Plaintiffs argue that, because Defendant Bahri owned the Terberg tractor and leased the MAFI trailer at issue, and was responsible for their maintenance and safe condition, Bahri is not entitled to summary judgment on this basis per Ross v. United States. (Doc. 52, p. 14.) Plaintiffs also contend, without citing any evidence, that "Bahri had substantial control over or was in charge of the instrumentality which caused the injury." (Id. ) In response, Defendant points out the lack of support in the record for Plaintiffs' substantial control argument and contends that the holding in Ross actually undermines Plaintiffs' claim in this regard. (Doc. 54, pp. 3-5.) Moreover, Defendant argues the mere presence of Bahri employees in the incident area is insufficient to establish liability under the active control duty. (Doc. 47-1, pp. 11-12.)
Plaintiffs' arguments as to this duty are reaching. As noted by Defendant, Plaintiffs offer zero evidentiary support for their conclusory claim that Bahri retained substantial control over the subject instrumentalities. The record in this case is devoid of any facts which indicate that Bahri had any role in the cargo operation on the day in question after it handed the Terberg and MAFI off to SSA. Mr. Washington *1358 testified that while vessel crewmembers may have been in the vicinity of the cargo area where he worked, they did not participate in cargo operations nor were they present at the pre-shift safety meeting. (Doc. 36-7, pp. 69-70.) This de minimis level of involvement does not trigger the active control duty. See Miller v. Navalmar (UK) Ltd., 685 F. App'x 751, 746 (11th Cir. 2017) (per curiam) ("[T]he shipowner must actually involve itself in the operational details of loading, or otherwise directly control the loading efforts of involved longshoremen effectively displacing the stevedore from its traditional control over loading operations.").
Furthermore, Bahri's ownership and lease of the subject equipment as well as its maintenance responsibilities are not nearly enough for liability to attach under this duty. In Ross, the court identified a host of facts, none of which are present here, that established the requisite level of active control to trigger this duty. 2012 WL 523631, at *7-9. For example, the ship's officer in Ross controlled the contract workers' hours and when they performed certain types of work. Id. The officer also, inter alia , set policies and procedures regarding use of the subject instrumentalities (hatches), was actively involved in the contractor's decisions, and required regular reports from contract workers for when a hatch was opened or closed. Id. Moreover, members of the ship's crew worked on certain hatches at the same time as contract workers. Id. None of these types of facts are present here. Thus, under Ross, it is clear that Bahri did not breach the active control duty, as it played no role in the offloading operation once it began. Accordingly, the Court finds, as a matter of law, that Defendant Bahri did not trigger or violate the active control duty and is entitled to summary judgment on this theory.
III. The Duty to Intervene
A vessel's duty to intervene arises when the stevedore's judgment in using or continuing to use defective equipment is "so obviously improvident" that the vessel, if it "knew of the defect and that [the stevedore] was continuing to use it, should have realized the [equipment] presented an unreasonable risk of harm to the longshoremen." Scindia, 451 U.S. at 175-76, 101 S.Ct. 1614. The same is true "if the defect existed from the outset and [the vessel] must be deemed to have been aware of its condition." Id. at 176, 101 S.Ct. 1614. The Fifth Circuit has interpreted the "obviously improvident" judgment standard as requiring a situation where "an expert stevedore ... use[s] an object with a defective condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm even when the stevedore's expertise is taken into account." Greenwood v. Societe Francaise De, 111 F.3d 1239, 1249 (5th Cir. 1997) (citations omitted). Further, a shipowner has an obligation to intervene only when it becomes aware that the ship's equipment "poses a danger to the stevedore and is also aware that the stevedore is acting unreasonably to protect the longshoremen." M/V Aqua Grace, 857 F.2d at 1581 (citation omitted) (emphasis in original). The duty is thus "exceedingly narrow," applicable to "only the most egregious decisions by the stevedore." Miller, 685 F. App'x at 757 (citations omitted).
Plaintiffs argue the duty to intervene was implicated because Bahri had notice that its Terberg tractor and MAFI trailer lacked safety chains or mounts. (Doc. 52, p. 15.) In support, they cite the factors identified by the Fifth Circuit in Casaceli v. Martech International, Inc. as relevant in determining whether the duty to intervene was triggered:
*1359 whether the danger was open and obvious; whether the danger was located within the ship or ship's gear; which party created the danger or used the defective item and was therefore in a better position to correct it; which party owned and controlled the defective item; whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and whether the shipowner assumed any duty with regard to the dangerous item.
774 F.2d 1322, 1328 (5th Cir. 1985) (citation omitted).[21] Under these factors, Plaintiffs reassert their (already rejected) open and obvious argument and argue the following: "the danger was within Bahri's equipment"; the danger "was in existence before the equipment was lent to SSA"; and "Bahri owned and controlled the defective equipment."[22] (Doc. 52, p. 15.) In this instance, each of these contentions argue the same essential point-Bahri's Terberg tractor and MAFI trailer were necessarily defective because they lacked safety chains. Defendant, however, argues that the evidence of record shows Bahri had no notice of any "obviously improvident" stevedoring practice related to the use of the tractor and trailer. (Doc. 54, pp. 5-8.) The Court agrees.
Although the use of safety chains may have been the safer choice, especially with the benefit of hindsight, based on the facts before the Court, it cannot be said that Bahri was on notice of "obviously improvident" use of its equipment by SSA. As the Court detailed in Section I, supra , SSA safely used Bahri's Terberg and MAFI without safety chains on prior cargo operations, and other stevedoring contractors had used this same equipment without incident. Captain Madsen testified that this incident was the first MAFI uncoupling in his ten years of experience. Moreover, SSA used the equipment to offload much of the steel coil cargo prior to the subject incident. During this time, Bahri was never alerted that any potential complications had arisen concerning its Terberg and MAFI. These circumstances simply do not give rise to a duty to intervene. See Bonds v. Mortensen & Lange, 717 F.2d 123, 127-28 (4th Cir. 1983) (no duty to intervene where malfunction of bell was obvious and known to all, and "the longshoremen proceeded to unload the ship's cargo without complaint or incident until the time of the accident"); see also M/V Aqua Grace, 857 F.2d at 1582 (no duty to intervene arose in part because the ship had not received "any complaint" regarding the cargo operation).
That is to say, the facts known to the vessel at the relevant time indicated that SSA's use of its equipment was being carried out with reasonable safety. Against this background, Plaintiffs fail to muster any evidence tending to show that Bahri was aware SSA was "acting unreasonably to protect longshoremen." Id. at 1581. Accordingly, based on the undisputed facts in the record of this case, the Court finds as a matter of law that the duty to intervene was not triggered or violated, and Defendant *1360 is due summary judgment on this theory as well.
CONCLUSION
Based on the foregoing, the Court GRANTS Defendant Bahri's Motion for Summary Judgment. (Doc. 47.) As such, summary judgment is granted to Bahri on both claims alleged in Plaintiffs' Second Amended Complaint: Mr. Washington's claim of vessel negligence under § 905(b) and Mrs. Washington's derivative loss of consortium claim. The Court DIRECTS the Clerk of Court to enter judgment in favor of Defendant and to CLOSE this case.
SO ORDERED , this 11th day of February, 2019.

Intervenor Plaintiff Homeport Insurance Company, (docs. 57, 62), did not file any responsive pleading to Defendant's Motion for Summary Judgment. Plaintiff Homeport Insurance Company sought, and obtained permission, to intervene on a limited basis to protect its lien interest in the outcome of this case pursuant to 33 U.S.C. § 933. (Id. )

Plaintiff's Second Amended and Recast Complaint, (doc. 38), is the operative pleading in this case. See Lowery v. Ala. Power Co., 483 F.3d 1184, 1187 (11th Cir. 2007) ("[A]n amended complaint supersedes the initial complaint and becomes the operative pleading in the case.").

Section 905(b) of the Longshore Act, which the Court discusses in greater detail throughout this Order, governs claims for injury to a person "caused by the negligence of a vessel," and its purpose is "to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action," Slaughter v. S.S. Ronde, 390 F.Supp. 637, 639 (S.D. Ga. 1974) (quoting H.R. Rep. No. 92-1441 (1972), reprinted in 1972 U.S.C.C.A.N 4698, 4703) ).

A longshoreman is a maritime laborer who is typically employed by a stevedoring company to load and unload cargo from ships in port. Cargo shipping companies whose ships call at the port contract the stevedoring company to oversee and implement cargo operations. See 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 10:8 (6th ed. 2018)

However, Bahri employees did not participate in the offloading operation itself nor did they participate in the pre-shift safety meeting. (Doc. 36-7, pp. 69-70.)

Supervisor Dotson testified that he would have "rejected" the operation had he deemed it unsafe, but, to the contrary, he found the selected operation and Bahri equipment to be safe for its intended purpose of discharging the steel coils off the vessel. (Doc. 36-2, p. 28, 32.)

These safety chains act as a secondary, emergency connection to prevent an accidental uncoupling and are attached between the tractor and trailer. (See Doc. 46-1, pp. 142, 177-78.)

Defendant asserts a second Terberg tractor and MAFI trailer combination, sourced from shore rather than the vessel, was also utilized in the cargo operation that day. (Doc. 52-1, p. 8; doc. 54, p. 7.) However, the evidence in this regard is unclear: Supervisor Dotson testified that he "believed it was just the [Terberg and regular MAFI along with the TICO and fixed MAFI being used]. It may have been three alternating, but I believe it was just the two." (Doc. 36-2, p. 41.) The other deposition testimony Defendant cites for the existence of a second Terberg tractor-MAFI trailer combination speaks of only one. (See Doc. 40-1, pp. 81-82.) Construing this evidence in Plaintiffs' favor, the Court proceeds as if only two sets of equipment were being used to offload the steel coils from the BAHRI HOFUF. (See Doc. 52, p. 2.)

Plaintiffs' expert witness, Henry Earnest Milam, M.S., testified that the term "safety hooks" does not necessarily equate to "safety chains," but that this provision refers generally to a "backup safety system ... other than just the gooseneck connection." (Doc. 46-1, p. 94.) At Defendant's Fed. R. Civ. Pro. 30(b)(6) deposition, its deponent, the Port Captain, indicated that he believed the gooseneck manual required the use of safety chains but that he was unaware of any legal standards requiring the same. (Doc. 40-1, pp. 12, 58.)

Mr. Milam testified that OSHA regulations require stevedores to visually inspect the vessel's equipment for safety prior to its use. (Doc. 46-1, pp. 83, 85-88.) In addition, the Stevedore Terminal Contract between Bahri and SSA granted the stevedore "sole discretion" over the use of vessel equipment and required the stevedore to "determine" whether such equipment complies with OSHA standards. (Doc. 40-1, p. 145.) And it mandated that "[a]ny equipment considered to be unsuitable to the [stevedore] shall not be used." (Id. )

What is more, Supervisor Watson noted that SSA has used Bahri's safety-chainless Terberg tractor and MAFI trailer (as well as those of other vessel companies) before without incident. (Doc. 36-2, pp. 25, 32.)

As a point of clarity, based on the Court's best reading of the record, the MAFI trailer seemingly uncoupled from the Terberg tractor at the gooseneck hitch, meaning the gooseneck lip and brackets on the Terberg came uncoupled from the MAFI's gooseneck tunnel and sockets causing it crash down the ramp. (See Doc. 40-1, pp. 36-37, 81-83; doc. 41-3, pp. 35-40; see also doc. 47-1, pp. 4-6.)

After investigating, Supervisor Dotson did not disagree with Captain Madsen's three possible causes and, moreover, had no other theories as to how the MAFI trailer became uncoupled. (Doc. 36-2, p. 38.)

The exact equipment substituted by SSA in place of Bahri's tractor and trailer is unclear. Supervisor Dotson testified that a TICO truck and MAFI trailer with a fixed attachment were used, (doc. 36-2, pp. 40-41), while Mr. Hills testified that a Terberg tractor and MAFI trailer equipped with safety chains were used, (doc. 36-2, pp. 46, 49). In either event, the evidence shows that Bahri's equipment was no longer used after the incident and was replaced by equipment with different attachment mechanisms.

Hendricks v. Earling Shipping Co., No. CV297-121, 1998 WL 684206, at *5 (S.D. Ga. May 4, 1998) (holding in the longshore context that "loss of consortium is a derivative claim" that can only be sustained when the defendant "is liable in tort to a spouse who is unable to provide consortium").

Defendant points to no cases from the Eleventh Circuit Court of Appeals, or from district courts within this Circuit, that follow the Fifth Circuit's approach. (See Doc. 54, pp. 2-3.) What is more, Defendant offers no authority from any other circuit that expressly adopt this approach, and the Court is unaware of any such authority from other circuits. On the contrary, district courts in the Eleventh Circuit have considered the open and obvious defense only in the context of a turnover duty to warn claim. See, e.g., Troutman v. Seaboard Atl. Ltd., No. 1:18-cv-21586-UU, 2019 WL 656259, 2019 U.S. Dist. LEXIS 4132 (S.D. Fla. Jan. 7, 2019) ; In re Natures Way Marine, LLC, No. CIV.A. 12-00390-KD-N, 2013 WL 6157928, at *7 (S.D. Ala. Nov. 25, 2013) ; In re Knudsen, 710 F.Supp.2d at 1273-74. Although the lack of supporting authority is not dispositive of this issue, that neither courts in this Circuit nor courts from other circuits have adopted the Fifth Circuit's approach militates against applying it in this case.

For example, in Kirsch v. Plovidba, the Third Circuit held that, under the various circumstances present there, the vessel did not violate its turnover duty of safe condition by the presence of an open and obvious oil spill, because there was insufficient evidence that the vessel "should not have assumed that [the stevedore] and its employees would avoid the obvious danger that the spill allegedly presented." 971 F.2d at 1033-34. On the other hand, in Bunn v. Oldendorff Carriers, the Fourth Circuit held that because the vessel had promised, but failed, to remedy an open and obvious ice patch, the circumstances there allowed a jury to reasonably find the vessel negligent. 723 F.3d at 461-63. The Oldendorff Carriers Court concluded that failing to fulfill a promise to remedy a dangerous condition "may also establish a shipowner's failure to exercise ordinary care" under the circumstances, even if the condition was open and obvious. Id. at 463.

Moreover, as noted by Plaintiff's own expert, OSHA longshoring regulations do not apply to foreign-flag vessels or their owners. (Doc. 46-1, pp. 99-100.); see also Brown v. Mitsubishi Shintaku Ginko, 550 F.2d 331, 333 (5th Cir. 1977) ("[T]he Longshoring Safety and Health Regulations apply only to employers; they do not automatically impose a duty on owners, operators, agents, or masters of vessels unless such persons are acting as employers." (citations and internal quotations omitted) ).

Although Plaintiffs denied "as cast" Defendant's assertion that Bahri's equipment had been used to discharge the steel coils twenty-five to thirty times over the course of approximately six hours, and argue the testimony is inconsistent as to when the incident occurred, (doc. 52-1, p. 8), Plaintiffs do not argue, much less present any evidence, indicating that the equipment had not been in use for some significant amount of time prior to the incident.
Indeed, testimony from Captain Madsen and Mr. Manning indicate that the equipment had been used for a significant period of time. Captain Madsen testified that the Terberg driver had "been up and down inside the ship, in and out, many times during the first six hours of the operation with no failure.... He ha[d] been down in that hold at least 30 times already with a MAFI successfully ... [a]nd now we're almost finished and, boom, now we have a problem." (Doc. 40-1, p. 81.) Captain Madsen continued, "He ha[d] been in there 30 times, something like that, maybe 25. But he'[d] been in there a lot." (Id. at p. 82.) Consistent with Captain Madsen's testimony, the Terberg driver, Mr. Manning, stated that once the incident happened there were "only maybe three more trips made after that. There wasn't much freight left down there.... It was about done, you know. It just happened close to the end, you know." (Doc. 41-3, p. 35.) Thus, the evidence is clear that SSA safely used Bahri's Terberg and MAFI for the majority of cargo operations that day.

The Third Circuit Court of Appeals has held that a vessel can be liable for failure to warn of an open and obvious hazard in two situations: "first if avoiding the hazard would be impractical for the longshoremen, or second, if the ship should have known that the longshoremen would confront the hazard." Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 409 (3rd Cir. 2006) ; accord Oldendorff Carriers, 723 F.3d at 465 & n.12, n.13 (discussing circumstances where a vessel could be liable for failing to warn of an open and obvious hazard and collecting cases). Plaintiffs, however, did not argue any of these circumstances were present on the day in question or that these exceptions apply to their case.

The Eleventh Circuit has recited these factors and upheld a district court's grant of summary judgment under them. See M/V Aqua Grace, 857 F.2d at 1582 (citing Casaceli v. Martech Int'l, 774 F.2d at 1328 ).

Plaintiffs also aver, without any accompanying support, that "no affirmative act of negligence or acquiescence in the use of the dangerous item occurred." (Doc. 52, p. 15.) The accuracy of this conclusory statement is far from clear based on the unresolvable nature of the uncoupling incident's precise cause. Given that Bahri's equipment had functioned without incident for much of the operation, it cannot be said for certain that no affirmative act of negligence occurred on the last discharge trip. (See Doc. 40-1, pp. 36-37; doc. 36-2, p. 38.) As such, the Court disregards this assertion.